For the foregoing reasons, the judgment of the district court is

AFFIRMED.

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Victor Natalio CRISPIN,**
**Defendant-Appellant.**

**No. 84–2391**
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

March 26, 1985.

Pena, McDonald, Prestia & Ibanez, L. Aron Pena (Court Appointed), Edinburg, Tex., for defendant-appellant.

Daniel K. Hedges, U.S. Atty., James R. Gough, Jr., Susan L. Yarbrough, Asst. U.S. Attys., Houston, Tex., Maury S. Epner, Atty., Washington, D.C., for plaintiff-appellee.

Before RUBIN, RANDALL, and TATE, Circuit Judges.

TATE, Circuit Judge:

The defendant Victor Crispin appeals from the judgment of conviction entered upon a jury's verdict finding him guilty of one count of conspiring to violate 8 U.S.C. § 1324(a)(2). See 18 U.S.C. § 371 (general conspiracy statute). 8 U.S.C. § 1324(a)(2) makes it unlawful to move or transport, or to attempt to move or transport, any alien within the United States, knowing that the alien is in the United States in violation of law and knowing or having reasonable grounds to believe that the alien last entered the United States within three years of the effort to move or transport him. In this case, specifically, the jury found that Crispin conspired with two others—Fidel Salinas and Francisco Maldonado—to transport forty-one citizens of the Dominican Republic from the border between Mexico and the United States to Houston, Texas, knowing that the forty-one foreign nationals were in the United States illegally.

On appeal, Crispin challenges his conviction on several grounds. Except for one, we find them all to be without merit. We agree with Crispin that the district court erred in admitting the judgments of conviction for unlawful entry into the United States of nine of the forty-one persons Crispin was convicted of conspiring to transport. Nevertheless, we do not agree that this error requires a new trial. Accordingly, we affirm Crispin's conviction.

## I.

At trial, four Border Patrol agents testified that forty-one persons were discovered hiding in brush on the Texas side of the Rio Grande River at a point near the river. The nearest legal entry from Mexico into the United States was fifteen miles away. After surveillance, the forty-one persons were arrested and detained. About one-half of them had Dominican Republic passports, none of which had been stamped with a United States visa. All of the passports showed recent travel from the Dominican Republic to Guatemala.

A Customs supervisor also testified at trial that he arrested Crispin's codefendants, Salinas and Maldonado, on the same day the Border Patrol agents arrested the forty-one persons along the Rio Grande. According to the Customs supervisor, Maldonado and Salinas drove into the United States from Mexico. Forty-one airline tickets were in their vehicle; each was for a round trip between the Dominican Republic and Guatemala, and the return ticket coupon had not been used on any of the tickets. Together, Maldonado and Salinas had approximately $13,500 in cash.

The government introduced testimony to show that the names of the persons on the airline tickets were the same as the names of the forty-one persons arrested along the Rio Grande. Maldonado and Salinas, called by the government to testify against Crispin, pleaded guilty to offenses involving the transportation of those persons.

Maldonado's testimony was something of a disappointment to the government. He denied any knowledge of activity concerning aliens illegally entering the United States. He had no knowledge that Crispin was involved in such activity. He testified that, although he drove into Mexico with Salinas, he and Salinas were separated for two hours. Maldonado denied knowledge of Salinas' activity while they were in Mexico and denied knowledge that Crispin was there. Maldonado conceded that Crispin telephoned him about a week before the events in issue—after two years in which the two men had not spoken—but contended that Crispin called only to inform him of a planned trip to Mexico.

Salinas contradicted Maldonado and provided the heart of the government's case. He testified that Crispin had telephoned Maldonado to arrange transportation of aliens, citizens of the Dominican Republic, who would be brought illegally into the United States. According to Salinas, Maldonado invited Salinas' participation, and Salinas agreed. Thereafter, Salinas and Maldonado drove to a town in Mexico and met with Crispin. Crispin gave them the airline tickets and approximately $13,500 in cash. The parties agreed that Salinas and Maldonado would pick up the forty-one aliens and, with the help of others, drive them to Houston. Salinas testified that Crispin promised them more money after successful transportation of the aliens.

The defense presented no witnesses. It relied on Maldonado's testimony, on alleged gaps in the government's evidence, and on Salinas' alleged motive to fabricate Crispin's involvement in exchange for a favorable plea bargain and sentence in his own case.

## II.

To convict Crispin the government had to prove that he conspired to move within the United States an alien present in the United States in violation of law. The only aliens in question were the forty-one persons arrested along the Rio Grande. The government could call none of these persons to testify, it alleged, because they had been released from custody and could not be located. To prove their illegal status in the United States, therefore, the government sought to introduce judgments of conviction of nine of the forty-one persons for the offense of unlawfully entering the United States. Over the objection of Crispin's lawyer, the district court admitted the judgments of conviction.

■ The judgments of conviction were admitted improperly. They were admitted for no purpose other than to prove the nine aliens' convictions, thereby establishing that the aliens were in this country unlawfully. This is flatly contrary to the directive of Fed.R.Ev. 803(22), which provides only for the admissibility of

[e]vidence of a final judgment, entered after a trial or upon a plea of guilty (but not upon a plea of nolo contendere), adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, to prove any fact essential to the judgment, *but not including when offered by the Government in a criminal prosecution for purposes other than impeachment, judgments against persons other than the accused.*

See *United States v. Vandetti*, 623 F.2d 1144, 1147–48 (6th Cir.1980); *United States v. Fleetwood*, 528 F.2d 528, 532–33 (5th Cir.1976); *United States v. Harrell*, 436 F.2d 606, 614–17 (5th Cir.1970).[1]

Though improperly admitted, the judgments of conviction were harmless beyond a reasonable doubt, assuming for the purpose of analysis the standard of review most favorable to Crispin. The issue at trial was not the legal or illegal status of the forty-one aliens. The real issue was Crispin's involvement with Salinas and Maldonado in moving the aliens within the United States.

Moreover, the other evidence of the aliens' illegal status—the sole fact sought to be corroborated by the improperly admitted convictions—was overwhelming. The government produced testimony that forty-

---

**1.** Violation of Rule 803(22) threatens two important constitutional interests. First, to the extent that the judgment of conviction reflects another jury's verdict embracing a finding on an element of an offense before the jury to whom the judgment is offered, it trenches upon a defendant's due process right to have the government prove every element of the offense with which he is charged. In short, the jury will certainly be influenced by, and may defer to, a finding of another jury, substituting the prior finding for the required evidence. Second, to the extent that the judgment of conviction reflects a guilty plea—equivalent to a testimonial admission of guilt—it trenches upon a defendant's right to confront his accusers. In this case, for example, the judgments reflect admissions by nine of the arrested persons that they were in this country illegally, an essential element of the offense charged against Crispin; yet, Crispin was unable to challenge by courtroom examination this assertion.

one Spanish-surnamed persons hid in the brush along the Rio Grande River inside the United States about fifteen miles from the nearest legal point of entry. Most had Dominican Republic passports, none of which showed United States visas. Plane tickets for each of the forty-one showed travel from the Dominican Republic to Guatemala, not the United States. Salinas testified that it was his clear understanding that he was to transport aliens illegally in the United States. Finally, the entire nature of the operation established the illegal status of the forty-one arrested aliens and their connection to the Crispin-Salinas-Maldonado venture. These facts overwhelmingly demonstrated the illegal status of the aliens in issue, and the admission of judgments of conviction as to nine of them could have caused Crispin no prejudice.

### III.

■ Crispin also contends that the evidence is insufficient to establish his involvement with Salinas and Maldonado, that the district court erroneously admitted co-conspirator hearsay, that the jury rendered inconsistent verdicts by acquitting him on other counts of the indictment, and that the district court improperly interrupted the examination of witnesses with its own questions. We find that these contentions are entirely lacking in merit and do not require discussion.

### IV.

For the foregoing reasons, Crispin's conviction is AFFIRMED.

AFFIRMED.