## COMMONWEALTH *vs.* LLOYD POWELL.

No. 95-P-1546.

Middlesex. February 12, 1996. - May 15, 1996.

Present: ARMSTRONG, KAPLAN, & PERRETTA, JJ.

*Robbery. Joint Enterprise. Evidence,* Joint enterprise, Firearm. *Practice, Criminal,* Instructions to jury.

At the trial of an indictment for armed robbery on a joint venture basis, a substantial risk of a miscarriage of justice was created by the judge's incorrect response to a question from the jury that the codefendant's plea of guilty and conviction of armed robbery constituted circumstantial evidence that the codefendant was armed with a weapon. [435-437]

Evidence at the trial of an indictment for armed robbery did not support a finding beyond a reasonable doubt that the defendant knew that the codefendant was armed at the time the crime was committed. [437-439]

At the trial of an indictment for armed robbery there was sufficient evidence to support a finding beyond a reasonable doubt that the defendant was guilty on a joint venture theory of unarmed robbery. [439]

INDICTMENT found and returned in the Superior Court Department on November 10, 1993.

The case was tried before *Margot Botsford,* J.

*Richard N. Foley* for the defendant.

*Robert W. Healy, III,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. The defendant, Lloyd Powell, appeals from his conviction on a joint venture theory of the crime of armed robbery.[1] For the reasons that follow, that conviction cannot stand. The case will be remanded for sentencing on an unarmed robbery basis.

---

[1]The defendant was also indicted as an accessory after the fact, but the judge charged that he could be found guilty of either charge but not both.

*Commonwealth's case.*[2] About 11:00 A.M., October 26, 1993, a weekday morning, Tracey Williams entered Pioneer National Bank in the Fresh Pond Mall in Cambridge, stood at the withdrawal counter for a time, and wrote on the back of a withdrawal slip, "This is a hold up! I have a gun. Please give me the 100's 50's 20's so no one gets hurt!!" She went to the tellers' line and handed the note to teller Senthimany Chanmughan. Chanmughan said she didn't have hundreds or fifties. "Whatever you have, give it to me so nobody is going to get hurt." Williams searched or fumbled in a small black bag she had placed on the teller's counter, saying, "I am looking for my gun." Chanmughan gave Williams about seventy-five dollars in tens, fives, and ones. Williams walked quickly out of the bank. Another teller, Danielle Pires, had overheard what Chanmughan said about not having the larger bills and knew it to be false. She pulled her silent alarm. Now, seeing Williams leave the bank, she ran to the customer service desk and picked up the keys to lock the bank door, as required by standard bank procedure in case of a robbery, but speedily she thought better of it and passed through the door to follow the robber.[3] Pires saw Williams walking very quickly, carrying a black bag, toward a car parked about a hundred yards from the bank. (Pires had not noticed a bag earlier.) As Pires, tailing Williams, neared the car, she observed that it was a two-door Mustang, white with a dark side stripe.[4] The car was facing and at a distance of fifteen feet from a parking lot exit to Fresh Pond Parkway. Both doors were open. Between the driver's side door and the car proper stood the defendant, Lloyd Powell, one hand on the door, the other on the car roof. Sophia Barnes stood between the passenger's side door and the car, both hands on the roof. The passenger's seat was already folded forward. On reaching the car, Williams plunged into the back seat. Powell and Bar-

[2]The Commonwealth's witnesses were the two bank tellers involved and a police officer who made the arrest.

[3]Pires had obeyed the standard procedure in a robbery of this bank some two weeks earlier. The result was that she could not tell the police the robber's direction of flight.

[4]Actually an Escort, but Pires and, later, Officer Arthur mistook it for a Mustang.

nes took the front seats; within seconds the doors shut, and Powell drove off.[5]

Pires saw Powell make a wrong left turn out of the area and reach a rotary where he drove toward Boston. From the guardrail, Pires had been able to read five of the six digits of the car license. Returning to the bank, she surrendered the number, together with a description of the car and the three occupants, to the police, who had arrived within minutes of the alarm.

About 11:14 A.M., North Cambridge police Officer William Arthur, on patrol with Officer Joseph Keough, received by radio in three transmissions the information imparted by Pires. By 11:20 A.M. Arthur had spotted the Powell car on the Cambridge side of the Charles River where Fresh Pond Parkway meets Greenough Boulevard by the Buckingham, Brown & Nichols School. The car was heading across the Eliot Bridge to Soldiers Field Road which eventually becomes Storrow Drive on the Boston side. Arthur followed. On Soldiers Field Road by Harvard Stadium before the exit to Harvard Square, Arthur radioed his position, then activated his blue lights and siren. The two cars intervening between Powell and Arthur pulled over, but Powell went on. From a distance of perhaps fifteen feet Arthur could see the occupants of the car looking back at the cruiser and talking to one another, with Williams in the back seat fidgeting and moving her hands. Powell drove two to three-tenths of a mile further before halting just short of the River Street underpass.

The officers left their stopped cruiser, taking a defensive position. Arthur ordered Powell to put his hands out his window. Backup arrived. Arthur went to the driver's side, and Powell emerged. Powell asked what was going on and Arthur said, "You just robbed a bank." Powell said nothing. The officers noticed Williams, still in the car, stuffing paper money under the rear carpet. Removed from the car, Williams said, "I did it. I did it. They know nothing."

The tellers were quickly brought to the arrest site. Chanmughan identified Williams, and Pires all three. Forty-five dollars in tens, fives, and ones were recovered from the carpet. A registration paper in the glove compartment indicated that Jerry Powell, the defendant's brother, was the car owner. No gun was found nor any black bag.

[5]Pires did not remember hearing the engine turn over or the tires squeal.

*Defendant's case.* The defense called Williams as its first witness. She had pleaded guilty a month earlier to the charge of armed robbery in this affair.[6] At 9 A.M. on the day of the crime, she flagged down the defendant as (without prearrangement) she saw him passing on Mission Hill in a car with Sophia Barnes. She asked for a lift to the Fresh Pond Mall in Cambridge where she intended to shop for a present for her daughter (Zayre's and Toys R Us were mentioned). The defendant was reluctant but agreed to take her when she said she would pay for the ride. (This, as developed in cross-examination and in testimony by the defendant, meant payment after return to Mission Hill.) When the party arrived at the mall, Williams said, she told the defendant to park the car near the exit, and he did so. The defendant and Barnes were seated in the front seats as she left the car. She walked to the bank and "did her business." She admitted the holdup but denied that in speaking to the teller she said she had a gun.

She took the "long walk" back to the car, arriving, apparently, as Barnes returned from Friendly's restaurant in the mall. She hadn't looked to see whether she was being followed. The car exited with a wrong turn to the left. When the police began to catch up on Storrow Drive, the defendant asked his carmates why they were being followed; at the arrest, he asked what had he done. Williams tried to hide the stolen money. When she quit the car she said, "I did it. They don't know anything." At no time, during the trip to the mall or on the way back, was there talk of a robbery; she did not tell them about it.

The defendant testified. At 8 A.M. he went to his brother's place on Blue Hill Avenue and borrowed his car and $25 to go to Brigham Circle and buy a cake for his daughter Harlalena's birthday that day. He picked up Sophia Barnes (mother of one or more of his children) on Codman Place. Williams — the defendant said he didn't know her that well[7] — hailed the car on Mission Hill and asked for a ride to the mall. He yielded when she said she wanted to buy a present for her daughter and would pay him for the favor of the trip. Williams told him where to park. He did not look to see

---

[6]The judge saw to it that Williams was independently counselled before she took the stand.

[7]See note 14 below.

where she walked on leaving the car. While she was gone,
Barnes went to Friendly's restroom; he followed there but
found the restroom occupied. He, then Barnes, returned to
the car. He said the doors of the car were closed when Wil-
liams returned. He had not seen Pires. He drove to the left out
of the parking area not knowing that this was wrong. He did
not understand why the police were pursuing, nor why he
was arrested. From outside the car, just after his arrest, he
saw Williams stuffing something. It wasn't until the next
morning, when he went before a judge, that he learned of the
robbery charge. There had not been any discussion of a rob-
bery during the trip. He was surprised, he said, that Williams
was not carrying presents when she reappeared, but he did
not inquire. He did not remember any black bag.

*Instructions.* As noted, the defendant was accused of armed
robbery on a joint venture basis, that is, of having aided Wil-
liams, the principal. Accordingly, the judge, as part of her
comprehensive instructions,[8] stated correctly that the jury, to
bring in a verdict of guilty of armed robbery against the de-
fendant, must have found beyond a reasonable doubt (1) that
Williams committed the crime, including the element that she
was armed with a gun at the time, and (2) that the defendant
aided Williams in perpetrating the crime, knowing that she
was armed with a gun. The judge also instructed on unarmed
robbery as a lesser included offense and allowed the choice on
the verdict slip.

As to Williams' commission of armed robbery, the judge
stated that on the element of gun carrying it would be enough
for Williams' conviction if the jury found she communicated
to the teller that she had a gun and after her departure from
the bank there was a space of time during which she could
have disposed of the weapon. There is support in the cases
for the judge's proposition, see *Commonwealth* v. *Delgado,*
367 Mass. 432, 435-437 (1975); *Commonwealth* v. *Howard,*
386 Mass. 607, 609-610 (1982); *Commonwealth* v. *Jackson,*
419 Mass. 716, 722-725 (1995); *Commonwealth* v. *Powell,* 16
Mass. App. Ct. 1016 (1983); and the evidence, besides being
undisputed as to the words on the paper handed to the teller
(Williams denied merely that she spoke them), allowed some
minutes during which Williams could have got rid of a gun,
whether or not enclosed in a black bag: for instance, the

---

[8]We need not digest the entire charge.

minutes between the car's appearance at the rotary and its coming under continuing observation by the police.

As to the defendant himself, there was sufficient evidence from which the jury could find that he aided the principal, Williams (see discussion below), but a serious question arises whether there was sufficient evidence to establish that he knew Williams was armed.

*Error in answer to jury's question.* After retiring, the jury put two questions to the judge: (1) "What was Tracey Williams convicted of? Armed robbery or unarmed robbery?" The judge answered, convicted on a plea of guilty to armed robbery. (2) "Does the prosecution have to prove a weapon was physically there?" Answer: yes. After further deliberation, the jury returned with three additional questions: (3) "Is a conviction of armed robbery evidence that there was a weapon?" The judge answered:

> "The answer to that question is, yes, a conviction of armed robbery, or evidence of a conviction of armed robbery in this case, is evidence concerning a weapon in that the conviction is of a crime and you know the elements of a crime include that a person was armed with a dangerous weapon and committed the robbery. It is not binding on you. It is evidence that you may consider along with all the other evidence in this case, the testimony of the witnesses that you've heard, the exhibits, et cetera, in order to determine for yourselves if the Commonwealth has proved in this case that a robbery occurred — that an armed robbery occurred. So, you may consider it as evidence, but it is not conclusive on that issue. It is to be treated by you along with all the other evidence that may be considered on this question."[9]

The judge was stating in essence that Williams' prior guilty plea to armed robbery in the same episode could be taken by the jury as (circumstantial) evidence of the presence of a gun

---

[9]The jury also asked (4) to hear or see a transcript of Williams' testimony (denied), and (5) to have the judge go over the first criterion under armed robbery, if possible in writing — this referred to the judge's original charge, of which the "first element" was that "the perpetrator [was] armed with a dangerous weapon" (the judge repeated her original charge in substance).

in the instant case against Powell. Here the judge erred. Rule 803(22) of the Proposed Massachusetts Rules of Evidence, accepted in *Flood* v. *Southland Corp.*, 416 Mass. 62, 70 & n.2 (1993), puts the matter at rest:

> "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . .
>
> (22) Judgment of previous conviction.
> Evidence of a final judgment, entered after a trial or upon a plea of guilty (but not upon a plea of nolo contendere), adjudging a person guilty of a crime punishable by death or confinement in excess of one year, to prove any fact essential to sustain the judgment, *but not including, when offered by the Commonwealth in a criminal prosecution for purposes other than impeachment, judgments against persons other than the accused.* The pendency of an appeal may be shown but does not affect admissibility." (Emphasis added.)

So, whereas proof of Williams' guilty plea could be used to impeach Williams as a witness, it could not be used as evidence against Powell. See to the same effect *United States* v. *Crispin*, 757 F.2d 611, 613 (5th Cir. 1985)[10] ; *United States* v. *Diaz*, 936 F.2d 786, 788 (5th Cir. 1991); Liacos, Massachusetts Evidence § 8.8.2 (6th ed. 1994); Weinstein's Evidence par. 16.07 [05] (1995).

As the defendant did not object to the judge's answer to question (3), we have to consider whether the error created a

---

[10]"Violation of Rule 803(22) threatens two important constitutional interests. First, to the extent that the judgment of conviction reflects another jury's verdict embracing a finding on an element of an offense before the jury to whom the judgment is offered, it trenches upon a defendant's due process right to have the government prove every element of the offense with which he is charged. In short, the jury will certainly be influenced by, and may defer to, a finding of another jury, substituting the prior finding for the required evidence. Second, to the extent that the judgment of conviction reflects a guilty plea — equivalent to testimonial admission of guilty — it trenches upon a defendant's right to confront his accusers." *United States* v. *Crispin*, 757 F.2d at 613 n.1.

substantial risk of a miscarriage of justice. See *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). The jury, as appears pretty plainly from their requests for help, were uncertain and anxious about a gun in relation to Powell, and well they might have been, for a gun figured like a phantom in the case. It seems quite likely that the judge's statement provided the force that pushed the jury over the line to a finding of Powell's guilt. That the statement came in response to the jury's direct question could invest it with special strength in the minds of the jurors. Thus we are persuaded that the error did create the predicated risk of injustice.[11]

*Resentencing for unarmed robbery.* The error in the judge's response was material, so the judgment of conviction must at all events be reversed. We go further: we think the evidence did not support a finding beyond a reasonable doubt that Powell knew (believed) that Williams was armed. However, the evidence fully supports a finding of his guilt of unarmed robbery as a lesser included offense.

On the critical question of the presence of a weapon, which is anterior to the question of the defendant's knowledge, Williams' previous conviction, as we have seen, cannot count as evidence against the defendant. If, then, we look to the actual evidence on the present record, it is telling largely in a negative sense. Williams shuffled in her bag without producing a gun; there was evidence that in her course from the bank she was carrying a bag, but there was no sign of a gun; no gun

---

[11]The defendant now complains that the judge in her remarks about armed robbery on a joint venture theory overemphasized the requirement that there be a weapon and underemphasized the requirement that the defendant have knowledge of it. We do not find the disparity in treatment that is complained of, and in any case we see no hint of a risk of miscarriage of justice.

Also in this appeal the defendant urges that his position was prejudiced by the reference in the evidence to his making no response when officer Arthur said he had robbed a bank. In fact this was elicited briefly by the defense in its cross-examination of Arthur. The matter had not been mentioned in the prosecution's direct examination of Arthur, but was referred to briefly in his redirect. It did not appear in the prosecution's closing argument. That the defense itself introduced the fact makes against its claim of injury, see *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983), citing to *Williams* v. *Zahradnick*, 632 F.2d 353, 361-362 (4th Cir. 1980), and anyway the testimony cuts no figure in the evidence as a whole. See *United States* v. *Canales*, 585 F.2d 137, 138-139 (5th Cir. 1978). No risk of a miscarriage here.

was found (or, as far as appears, was searched for) by the police along the route from the bank to the terminus on Storrow Drive; no gun was found in the car or on the person of any of the three occupants (and the bag was gone). On the other hand we have Williams' withdrawal slip (and similar oral statement) threatening a gun, which could well have been a bluff, although accomplishing a purpose to frighten the teller.

In the degree that there is a grave doubt about the presence of a gun — a gun "physically there" — there must be the same or a graver doubt about the element of the defendant's knowledge. In cases where it has been proved or conceded that a weapon was used, an accessory's knowledge of it, when not shown directly, may sometimes be fairly imputed to him through circumstances such as a proved chance to have observed the weapon at first hand[12] or opportunity for and likelihood of communication with the principal about the gun anticipating the commission of the particular crime.[13] In the present case there is little room for indulging such collateral inferences because of the weakness of the evidence about any real gun. At all events, any strong association between the defendant and Williams was unproved,[14] and if planning occurred during the ride (of dubious duration)[15] from Mission Hill to Fresh Pond Mall, we do not know what it was. Taking the evidence in the light most favorable to the Commonwealth, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979), we conclude that the defendant's motion for

[12]See *Commonwealth* v. *Barry*, 397 Mass. 718, 720-722 (1986); *Commonwealth* v. *Chay Giang*, 402 Mass. 604, 609 (1988); *Commonwealth* v. *Stewart*, 411 Mass. 345, 351 (1991).

[13]See *Commonwealth* v. *Amaral*, 13 Mass. App. Ct. 238, 243-244 (1982); *Commonwealth* v. *Tracy*, 27 Mass. App. Ct. 455, 458 (1989); *United States* v. *Sanborn*, 563 F.2d 488, 490 (1st Cir. 1977).

[14]The Commonwealth presented no evidence about this. Williams testified that the defendant was a "friend." When asked how long he had known Williams, the defendant responded, "I didn't know her that long. I didn't know her that long. I just been seeing her around."

[15]The defendant claimed that after picking up Williams on Mission Hill he drove approximately fifteen to twenty minutes to Fresh Pond Mall. This does not square well with the purported times of around 9 A.M. (Williams' account) or between 9 A.M. and 10 A.M. (the defendant's account) of Williams "flagging down" the defendant for a ride and the robbery at approximately 11 A.M.

a required finding of not guilty of armed robbery should have been allowed.

The question of the gun and knowledge of the gun to one side, we see ample evidence, upon which the jury could, and evidently did rely, that the defendant assisted as a joint venturer in the acknowledged robbery of the bank. He drove Williams to the mall; parked facing the exit; was waiting with the car doors open and seat folded for Williams' return; and accomplished a speedy departure. Williams is found stuffing money at the time of the arrests. The jury could and did reject the defendant's protestation that he was unaware he was aiding in the crime. As in *Commonwealth* v. *Howard,* 386 Mass. at 609 n.2, where an armed robbery conviction was reversed and the case remanded for sentencing on the lesser included offense of unarmed robbery, "There is no question that [had the jury not convicted the defendant of armed robbery] the jury would have been warranted in finding the defendant guilty of unarmed robbery." The judgment is modified to show a conviction of unarmed robbery, and the case is remanded for resentencing as upon that offense.

*So ordered.*