Commonwealth *v.* Johnson.

## COMMONWEALTH *vs.* ERICK JOHNSON.

No. 95-P-301.

Suffolk. April 2, 1996. - August 12, 1996.

Present: LAURENCE, KAPLAN, & FLANNERY, JJ.

*Practice, Criminal,* Required finding, Argument by prosecutor. *Assault by Means of a Dangerous Weapon. Assault and Battery. Threatening. Evidence,* Prior misconduct, Credibility of witness, Rebuttal.

Sufficient evidence was presented at a rape trial to support the jury's guilty verdict. [86-87]

At a rape trial the judge correctly excluded evidence of the victim's default on unrelated larceny charges offered to impeach the victim's credibility. [87-88]

At a rape trial, evidence offered in rebuttal of the defendant's claim that he had not been given Miranda warnings before talking with police was properly admitted in evidence. [88-89]

At a criminal trial the prosecutor properly commented in closing argument on the credibility of the defendant and any tendency for the remarks to have shifted the burden of proof was amply corrected by the judge's instructions. [89-90]

INDICTMENTS found and returned in the Superior Court Department on October 16, 1992.

The cases were tried before *Robert W. Banks,* J.

*Daniel W. Rice* for the defendant.

*Nancy L. Hathaway,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Charged on four indictments of aggravated rape, one of assault by means of a dangerous weapon, three of assault and battery, and one of threatening to commit a crime, the defendant Erick Johnson, upon trial by jury, was found not guilty of the rape charges, but guilty of the other charges. On his appeal from the convictions, the defendant claims that the judge erred in denying his motions for required findings

of not guilty on the subsisting charges, in ruling on two evidentiary matters, and in denying corrective instructions regarding the Commonwealth's closing argument.

*Commonwealth's case.* The victim, thirty-nine years old at the critical time, testified that in early evening, August 25, 1992, she was at 649 Walk Hill Street, in the Mattapan section of Boston, the home of her boyfriend, Douglas Quarles (known as "Katz"). About 5:30 P.M., the defendant, Erick Johnson, then aged twenty-six, stopped by after work and visited with the victim and Katz, his friends. He stayed perhaps an hour and a half, leaving around 7 P.M. The victim left soon thereafter. The defendant returned to Katz's around 8 P.M. The victim had come back. The defendant used the telephone and left.

About 10:45 P.M. the defendant came to Katz's for the third time and stayed some thirty to forty-five minutes. He seemed distraught and was weeping. In a bedroom doorway, he had a conversation with the victim; Katz and one Steve Key were nearby but evidently could not overhear. The victim said the defendant asked her to walk with him to his "cousin's house" so that he could talk. The previous Friday, he had told the victim and Katz that his sister in Brockton had been killed. Wishing to comfort the defendant, the victim asked Katz if it was "okay" for her to go walking. Katz agreed, and the victim stepped out with the defendant. It was about 11:15 to 11:30 P.M. Now the defendant said the cousin lived on Tennis Road, Mattapan.[1]

At the defendant's suggestion, the pair stopped at 75 Mattapan Street, the nearby home of their friend Jerome Powell (a drug dealer, according to the defendant's later testimony). The visit was over in five minutes. Leaving Powell, the two took Fottler Road, then Almont Street toward Almont Park, on the way, as the defendant indicated, to the cousin's place.

Entering the park or playground — an area perhaps 750 by 950 feet, empty, moonlit — the defendant, "out of the blue," said, "You don't love Katz, you love me." The victim said she smiled: "What's wrong with you, you crazy?" A few minutes later, the defendant suddenly struck her across the face, knocking her and her glasses to the ground. The defen-

---

[1]Katz testified to the defendant's three visits and his demeanor during the third; also to his, Katz's, agreeing to the victim's taking the walk.

dant pulled down the zipper of his pants. She screamed. He punched her in the face, put his hand over her nose and mouth, and said he would kill her if she didn't shut up. When he released his hand, she screamed again; he punched and kicked her. "[He] went under his shirt and pulled out something and he said it was a gun." She felt, pressed up her back, what she took to be a gun, although she did not see it. She ceased screaming. The defendant dragged her, with the object at her back, across a grassy area, then guided her, as she came upright, to a rocky, wooded section of the park.

The defendant pushed the victim to the ground and pulled off her panties and ordered her to undress. She did so. He had removed his shirt; she did not testify just how far he undressed. He penetrated her vaginally with his penis. He said, "You're not going to hurt me like Trina hurt me, you don't want Katz, you love me." He ordered her to fondle and suck him, which she did. He penetrated her twice more, and suggested anal intercourse but did not do it. With the attack finished, he threw the victim her dress.[2] As she drew on her clothes, he said repeatedly that he would have to kill her because she was going to tell. He began to pull his shirt over his head. This gave the victim her chance to jump up and scream and run toward the nearest lit house, 37 Almont Street. She arrived yelling, "This guy is behind me, he's trying to kill me." She said she could hear the sound of "bushes behind me" as she ran.

Officer Karen Tognarelli appeared at the house about 12:10 A.M. in response to a call. Tognarelli testified that the victim was crying, disheveled, her dress on backward and inside out. The victim said she had been raped and gave her account of it. She asked to be taken to Katz's where she felt safe. Later she went by ambulance to Brigham & Women's Hospital where a rape kit was administered. About 1 A.M. the victim, wearing a hospital johnnie, was interviewed for an hour and a

---

[2]The victim had been wearing, besides panties and dress, a hat, bra, slip, and black cloth flat shoes. The police, after search in the park, recovered the panties. On reaching refuge, the victim had bra, slip, and dress. Katz said he found the hat in the park two days after the alleged attack but did not find the glasses.

half or more by Officer Bernadette Izzard Stinson and again gave her account.[3]

The victim testified that her right eye was swollen, discolored and puffy, both eyes red, her hand bruised; that she was soiled, covered in leaf fragments. Though Tognarelli did not observe physical injuries, Stinson corroborated the swollen eye. The medical record showed orbital edema of right eye, scratches to right thigh, mild suprapubic tenderness, and injury, though no fracture, to left hand. (It may be noted that the observations testified to occurred at different times.)

The Commonwealth's criminalist, Stanley Bogdan, testified that the victim's bra and slip were soiled, and the dress heavily so; the panties showed vegetation fragments, and a yellowish stain (testing negative for semen). Fingernail scrapings were clear of skin fragments and dirt. Head and pubic hair samples were referable only to the victim. Vaginal and genital swabs showed semen; oral swabs did not.[4]

*Defendant's case.* Attacking the credibility of the victim,[5] the defendant suggests that she fabricated the rape story to avert Katz's wrath. The victim and Katz agreed that on June 14, 1992, the victim secured a restraining order against Katz after a violent fight in which Katz said, "No bitch leaves me, I'll fuck you up," stalked her with a knife, and bit her. As Katz chased after her, the victim fled for safety to the nearby home of Jerome Powell (the victim rather said that "Jerome

[3]The testimony of Officers Tognarelli and Stinson about what the victim told them of the episode was generally consistent with the victim's testimony. However, neither officer recalled the victim referring to the visit with Powell; the victim said she mentioned it to Stinson (attributing to nervous exhaustion the earlier oversight in failing to mention it to Tognarelli). Tognarelli said the victim did not mention a gun; Stinson recalled that the victim did mention the gun in their colloquy at the hospital.

[4]Bogdan tested the semen for blood group substances. It yielded none, hence matching the semen to its secretor on that basis could not be done. Bogdan said that other possible tests, including phosphoglucomutase testing and DNA typing existed, but were not conventionally done in Bogdan's laboratory and, as was the protocol there, no further testing was performed. Such semen testing as Bogdan performed thus neither proved nor disproved a link to the defendant.

We observe that the Commonwealth did not furnish Bogdan with any body samples from the defendant.

[5]The defendant's own credibility suffered from his admission from his criminal record of two past convictions for wrongful destruction of property.

happened to be outside"). Katz was convicted of assault with a dangerous weapon. In their testimony, Katz and the victim attributed the fracas to Katz's severe drinking from which, they said, he had recovered.

The defendant suggests that, after leaving Katz's shortly after the defendant's departure from his 5:30 P.M. visit on August 25, the victim may have been with Powell and then staged an arrival at the lit house beside the park. (This would conflict with the victim's account that she returned to Katz's before the defendant's 8 P.M. visit). The defendant sees some significance in the victim's omission to mention the late night stop at Powell's to Officer Tognarelli or Officer Stinson (see note 3, *supra*). Responding to the idea that the victim could have acted to circumvent Katz, these two testified that their relationship improved after the June 14 episode; by August 25 they were on good terms, and the victim had no fear of Katz.[6]

The defendant testified to the victim's possible reasons or motives for singling him out for false accusations. He said he had taken cocaine with the victim in 1991, that she gave him money to buy her drugs (supplied by Powell), and that she talked with him at Katz's during his 5:30 P.M. visit on August 25 and confronted him about money due her. He said he answered, "[I]'m not into that no more, I don't do drugs any more," but presumably that wouldn't have quelled her complaint. In his interview on August 26 with Officer Joseph Lally (see *infra*), the defendant suggested that it was the victim's differences with his former girlfriend Trina that explained the victim's animus; he mentioned a drug debt but did not point to a confrontation with the victim on the matter on August 25. On her part, the victim denied she had given the defendant money to buy drugs and denied talking about drug money with the defendant on August 25. She admitted taking drugs with the defendant some three years before the attack, although not friends with him at the time, and she gave equivocal testimony about using crack cocaine in 1991,

[6]Although the defendant says he did not return to Katz's after his 5:30 P.M. visit (see *infra*), he remarks on the victim's own testimony that she later asked Katz's "okay" to take the walk — a further showing, according to the defendant, of Katz's threatening hold over the victim. The victim testified that she asked out of "respect and caution": "I just felt more comfortable letting him [Katz] know what I was doing."

although also stating that she had been drug free since January, 1991.

The defendant's mother, Bessie Thompson, joined the defendant in testifying that no sister of his had died, and the defendant said he had no cousin who lived in the Mattapan area. But the Commonwealth could suggest that the defendant lied on these points as a means of inveigling the victim into the walk. The route claimed by the victim from Katz's toward an alleged cousin on Tennis Road was curiously circuitous (particularly out of the way was the entry into the park) and thus, the defendant contended, unlikely. The riposte was that the victim did not care that the walk was roundabout as her purpose was to talk to the defendant and console him.

By way of alibi, the defendant, while admitting to a visit at Katz's at 5:30 P.M. on August 25, denied any later visits that day.[7] After leaving Katz's, he said, he went to his mother's house, 222 Almont Street, Mattapan. As he started in that direction, the victim, unprompted by him, left Katz's and walked behind him for a while, then turned away. He spent several hours at his mother's place, then went to the house of William Sheffield, 717 Walk Hill Street, Mattapan, arriving about 8:30 P.M. He drank beer and talked with Sheffield and Sheffield's friends until he fell asleep on the porch. Some time that night he awoke, walked to a room he had rented at 47 Hiawatha Road to pick up some clothes and a toothbrush, then returned to Sheffield's where he spent the night. He went to work the next morning. He said he took no late night walk with the victim and was not involved in any rape or attack as charged. The defendant's stepfather, Nathan Thompson, testified that the defendant worked a normal day on August 25, 8 A.M. to 5:30 P.M. (Thompson supervised the defendant as a mechanic trainee at a Mattapan garage.) The mother testified that on August 25 the defendant was at her house from 5-5:30 P.M. to 8 P.M.[8] The defendant's presence at Sheffield's was attested to rather weakly by Sheffield and one Marcus Reese: they could only fix a meeting as having happened on some day in late August, 1992.

*Motions for required findings.* By reference to the familiar

---

[7]In his testimony the defendant did not specify when this visit ended. The victim put it at 7 P.M. The defendant in his interview with Lally mentioned 6 P.M.

[8]See note 7, *supra.*

rule of *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), the defendant, to succeed on this appeal, would have to persuade us that no rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crimes beyond a reasonable doubt. On the contrary, we are persuaded that the Commonwealth presented sufficient evidence to support the guilty verdicts.

The victim's testimony alone made out the elements of the assault and threat offenses and could readily be accepted by a conscientious jury.[9] Confirming the victim's testimony was Katz's account of the defendant's visits to Katz's place and the final departure together of victim and defendant; the observations of officers Tognarelli and Stinson and the consistency of the victim's story as told to them; the physical details reported by Bogdan; and the medical summary of the victim's condition.

We note, in passing, that the defendant's claim of alibi was in conflict with the foregoing evidence and otherwise weak. The defendant's friends could not specify the day of his purported late night visit at Sheffield's house, and even his mother's testimony may have done him more harm than good in setting the hours he supposedly spent with her. So also, the defendant's testimony and his avowals to Officer Lally about the victim's supposed motives for punishing the defendant, not to speak of the elaborate fabrications that would be required to achieve the result, were hard to credit. The same can be said of the suggestion of a connection between the victim and Powell that day that had to be hidden from Katz by the camouflage of claims of assault and rape.[10]

*Evidentiary matters.* (a) During cross-examination, the

---

[9]Conscientiousness evinced by their acquittal of the rape charges possibly on the scruple that the semen testing that was done proved equivocal (and the oral swabs negative), and that the Commonwealth chose not to attempt to carry out further tests.

[10]As to the charge of assault with a dangerous weapon (a handgun), the judge instructed generally on the elements of the offense. As the victim did not claim to have seen the gun (but felt an object that the defendant said was a gun), it might have been better for the judge to instruct also that the defendant's statement plus his opportunity to dispose of the gun could be taken as proof that a gun was employed. See *Commonwealth* v. *Delgado,* 367 Mass. 432, 435-437 (1975); *Commonwealth* v. *Howard,* 386 Mass. 607, 609-610 (1982); *Commonwealth* v. *Jackson,* 419 Mass. 716, 722-725 (1995);

victim admitted she was in default on a criminal charge out of Dorchester District Court for passing a bad check at a Stop & Shop market. Counsel asked if she was also in default on a charge for a check at a Purity Supreme market; she answered, "No, not to my knowledge." At the close of the defendant's case, counsel offered documentary evidence of the victim's default on larceny charges touched on in the cross-examination. The trial judge declined the offer. It is perhaps enough to say of this entire by-way in the trial that "[e]vidence of prior bad conduct may not be used to impeach a witness's credibility except by production of records of criminal convictions pursuant to G. L. c. 233, § 21." *Commonwealth* v. *Clifford*, 374 Mass. 293, 305 (1978); Liacos, Massachusetts Evidence § 6.9.2, at 304 (6th ed. 1994). If, on some strange basis, the documents were deemed admissible, the loss to the defense from their exclusion would be minimal, as the victim had conceded her fault in respect to the Stop & Shop charge.

(b) The day following the alleged attack, the defendant, accompanied by Leroy Thompson, came to the police station, and the defendant was interviewed on tape by Officer Lally, with Thompson and another officer present. At trial the defendant claimed on direct examination that he had not been read his Miranda warnings until after the taping had begun and that before the taping he had been handed a paper that he didn't understand. Thompson testified that Miranda warnings were not given until the taped interview had ended. Thompson also said the police had not handed the defendant a police report before the interview and had not told the defendant he was being questioned about a rape until five to ten minutes into the interview. The effect of all this was to suggest that the defendant had been abused in making his early definitive statement and possibly to raise a constitutional issue.

In rebuttal, the Commonwealth offered Lally, who had not previously testified, along with the reading of a redacted

*Commonwealth* v. *Powell*, 16 Mass. App. Ct. 1016 (1983); *Commonwealth* v. *Powell*, 40 Mass. App. Ct. 430, 434 (1996). A jury that found that a gun was used without this addendum to the instructions could also have found that the opportunity to dispose was present, so no miscarriage of justice could be imagined.

transcript of the interview.[11] Lally said he gave the defendant Miranda warnings, and the defendant completed a "Miranda waiver form" before the tape began. First paragraph of the transcript reads:

> "Today is Thursday, April 26, 1992. It's 7:00 P.M. Speaking is Joseph Lally, Boston Police Department . . . . Present here is Detective Jack Hamm of the Boston Police Department; Mr. Erick Johnson, who is the suspect in a rape reported on August 25, 1992; and Mr. Johnson's step-father, Mr. Thompson. Mr. Johnson has been given his Miranda warnings. We will read them one more time for the benefit of the tape [which Lally then did]."

The rest of the reading, about twenty pages, centered on the defendant's connection with the victim and his whereabouts the night of the alleged attack.

The admission of this rebuttal was objected to. "Rebuttal introducing a new subject (especially when the opposing party may be caught unprepared to meet it) is open to objection. Rebuttal is legitimate when it responds to the opponent's case; in this circumstance, at any rate, the judge, as controller of the trial, has a nearly unreversible discretion to allow it." *Commonwealth* v. *Guidry*, 22 Mass. App. Ct. 907, 909 (1986). The rebuttal herein was "responsive" and thus "legitimate."

*Closing argument.* In closing the prosecutor urged the jury not to let the defendant "talk his way out of" the charges. Thus: "Johnson may think he's a pretty good talker, but he can't talk his way out of this one"; "Tell him you don't believe what he said . . . by returning verdicts of guilty." The defendant requested but was denied specific instructions to ignore such language. The tone might not satisfy every taste, but a prosecutor, after all, "may argue that defense witnesses, including the defendant, are not credible," *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 746 (1990), nor is it improper for the prosecutor "to indicate that the defendant attempted to 'fool' the jury," *Commonwealth* v. *Shea*, 401 Mass. 731, 739

---

[11]There was lengthy sidebar discussion of the way to present the interview to the jury with agreement that the prosecution could read an authenticated transcript from which objectionable material (e.g. defendant's time in jail) had been deleted.

(1988). If there was any hint in the prosecutor's remarks that the burden of proof lay with the defendant, the judge's charge amply corrected for this, stressing that the burden rested with the Commonwealth and never shifted to the defendant and, specifically, that "[t]he Commonwealth must disprove his [defendant's] alibi beyond a reasonable doubt." There was no error.

*Judgments affirmed.*