## COMMONWEALTH *vs.* ANGEL LUIS PAGAN.

Hampden. February 7, 2003. - September 9, 2003.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Homicide. Armed Home Invasion. Evidence,* Prior misconduct, Rebuttal. *Practice, Criminal,* Capital case, Assistance of counsel, Instructions to jury, Comment by judge.

At the trial of indictments charging murder and armed home invasion, the judge properly admitted prior bad act evidence of one incident that was probative of the defendant's hostile attitude toward the victim, his intent to kill the victim, and the premeditated nature of the later killing, and of another incident that was highly probative of his motive. [87-88]

At the trial of indictments charging murder and armed home invasion, no substantial likelihood of a miscarriage of justice arose from the admission of evidence, offered in rebuttal, of a prior bad act of the defendant, where the evidence responded to the defendant's case, where the incident touched on matters of substance in addition to matters that were collateral and went only to impeachment, and where the judge's limiting instructions, given both at the end of the rebuttal testimony and during his final instructions, minimized the risk of undue prejudice. [88-90]

This court concluded that a criminal defendant's trial counsel was not ineffective in failing to object to rebuttal evidence that the judge properly admitted or in failing to pursue a defense that the evidence did not support; moreover, this court did not reach a claim of ineffective assistance that relied on materials that were not part of the record. [90-91]

The judge's comment to the jury at a criminal trial that there was a possibility that more witnesses would be called could not have prejudiced the defendant and did not constitute a missing witness instruction. [91-92]

The evidence at the trial of indictments charging murder and armed home invasion was sufficient to convict the defendant of both murder in the first degree on a theory of deliberate premeditation and armed home invasion, which was not duplicative of the murder conviction, but remained a separate and distinct crime. [92-93]

.

INDICTMENTS found and returned in the Superior Court Department on January 4, 2001.

The cases were tried before *Daniel A. Ford,* J.

*Matthew A. Kamholtz* for the defendant.

*Jane Davidson Montori,* Assistant District Attorney, for the Commonwealth.

SOSMAN, J. A Superior Court jury convicted the defendant of armed home invasion and murder in the first degree on the theories of deliberate premeditation and felony-murder. On appeal, the defendant claims that the judge erred in allowing the prosecutor to introduce evidence of prior bad acts and to present some of that prior bad act evidence by way of rebuttal. In a pro se brief, the defendant also claims that he received ineffective assistance of counsel, that the judge gave an improper missing witness instruction, and that there was insufficient evidence to convict him of either armed home invasion or murder. Finally, the defendant asks this court to exercise its power pursuant to G. L. c. 278, § 33E, and order a new trial. For the reasons set forth below, we affirm the convictions and decline to award relief under G. L. c. 278, § 33E.

1. *Facts.* Viewed in the light most favorable to the Commonwealth, the evidence was as follows. Beginning in 1990, the defendant had a relationship with Rosa Cruz, but broke off that relationship in the winter of 1993, a few months after Cruz became pregnant with the defendant's child. Thereafter, Cruz refused to see the defendant, but, after the baby's birth in May, 1993, did allow him to visit the baby. On June 5, 1993, the defendant, carrying a gun in his pants, kicked in the door of Cruz's apartment and threatened to kill Cruz if he saw her with another man.

Sometime in early 1994, Cruz began a new relationship with another man, Angel Tolentino. The record is unclear as to when the defendant found out about this new relationship. On October 10, 1994, the defendant confronted Tolentino and his brother in an alley. Tolentino said to the defendant, "We got to talk." The defendant replied, "We don't have to talk about anything," and pulled out an automatic pistol. The defendant pointed the gun at Tolentino and pulled the trigger, but the gun jammed. The defendant swore, and tried to cock the weapon again and clear the jam, but Tolentino and his brother fled.

One week later, during the evening of October 17, Cruz and Tolentino were in Cruz's apartment. The defendant knocked on the door, but Cruz refused to answer. Undaunted, the defendant kicked in the door and entered the living room. He first looked at Tolentino, then "smacked" Cruz in the face. After the

defendant left, Cruz telephoned the police and reported the incident.

Three days later, on the night of October 20, at approximately 8:30 P.M., the defendant returned to Cruz's apartment accompanied by two men. At the time, Cruz was in the bathroom taking a shower; her friend, Belinda Santos, was doing laundry in the kitchen; Tolentino and Santos's boy friend, Steven Cartwright, were watching television in the living room with Cartwright's three year old son and Cruz's two children. Suddenly and unannounced, the defendant and one of his companions came through the door and into the living room while the third man stood in the front door. Tolentino retreated to the bedroom, locking the bedroom door behind him. The defendant said, "There he is," and the defendant and his cohort headed down the short hallway that led to the bedroom. Both men drew semiautomatic weapons from their waists, pulled back the slides of the weapons, and kicked open the bedroom door. The two guns fired two shots each, with three of the shots striking Tolentino. One shot hit Tolentino in the chin and passed through the back of the neck, severing the spinal cord. The medical examiner opined that that shot had been fired at a range of from eight to ten inches, and that such a wound would be fatal within at most a few minutes. Before leaving the apartment, the defendant stopped in the living room and stared at Santos for a moment with a smile on his face. During the encounter, Santos feared that he would shoot her.[1]

After the men left, Cruz came out of the bathroom and discovered Tolentino bleeding on the floor of the bedroom. Santos entered and told Cruz that "Lito" (a nickname referring to the defendant) had shot Tolentino.[2] They contacted the Springfield police and tended to Tolentino's injuries while awaiting their arrival. After an ambulance took Tolentino away, police officers escorted Santos and Cartwright to the police station.

[1]Cartwright had grabbed his son and fled to an upstairs apartment when he saw guns being drawn.

[2]Santos had seen the defendant on several prior occasions, and knew him as the father of Cruz's daughter. The defendant acknowledged that he had encountered Santos before and testified that he had had an argument with her four days prior to the shooting.

Both Santos and Cartwright picked the defendant's photograph from an array and identified him as one of the assailants.

In the early morning hours of October 21, the police obtained a warrant for the defendant's arrest. They tried to locate the defendant at five different addresses, but could not find him that morning or at any time over the next several weeks. The defendant acknowledged that a friend warned him early in the morning of October 21 that the police were looking for him in connection with a homicide, and that he immediately fled to Buffalo, New York. He lived there for approximately six years, using false names and false identification. He then moved to Florida, still using a false name, and he was apprehended there in late 2000.

2. *Discussion.* a. *Evidence of the October 10 and October 17 incidents.* The defendant argues that prior bad act evidence concerning the October 10 incident (in which the defendant attempted to shoot Tolentino) and the October 17 incident (in which the defendant, in the presence of Tolentino, slapped Cruz) was erroneously admitted over his objection. "Evidence that has relevance to issues other than bad character or criminal propensity is admissible if not outweighed by its unfair prejudice, which is a determination for the judge to make and one which we do not disturb unless, in our judgment, it is palpably wrong." *Commonwealth* v. *Fordham*, 417 Mass. 10, 22 (1994).

With regard to the October 10 incident, the judge allowed the Commonwealth to admit the evidence on the ground that it was probative of the defendant's intent and motive.[3] There was no error. Evidence that the defendant attempted to fire a deadly weapon at Tolentino just ten days prior to the actual killing is

[3]The prosecutor also sought to introduce this evidence on the ground that it was probative of identity. However, the judge's limiting instructions, given to the jury at various times, made clear that the evidence was to be used solely for the purpose of proving intent and motive.

The prosecutor did make a comment during closing argument to the effect that the evidence was probative "on the issue of identification." There was no objection, and no claim is made on appeal concerning that improper comment. We are satisfied that the comment did not create a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E. There was only one reference to using the evidence for purpose of "identification"; the judge gave repeated and explicit instructions that the evidence was to be used solely with respect

probative of the defendant's hostile attitude toward Tolentino, his intent to kill Tolentino, and the premeditated nature of the later killing. See *Commonwealth* v. *Squailia*, 429 Mass. 101, 105 (1999), and cases cited. Shortly after the introduction of this evidence, the judge instructed the jury that they could not consider such evidence as evidence of bad character or propensity to commit a crime, and that they could consider the evidence solely on the issues of the defendant's motive or intent in connection with the events of October 20. See *Commonwealth* v. *Snell*, 428 Mass. 766, 778, cert. denied, 527 U.S. 1010 (1999) (judge's instruction reduced possible prejudice from prior bad acts evidence).

As to the October 17 incident, the judge allowed evidence that the defendant kicked open the door of Cruz's apartment, saw Tolentino and Cruz together, and immediately thereafter struck Cruz in the face. The defendant objected to that portion of the evidence that referenced his striking Cruz. Again, the evidence was probative of issues other than the defendant's bad character or criminal propensity. That the defendant hit Cruz on seeing her and Tolentino together in her apartment[4] indicated the defendant's disapproval or upset and was highly probative of his motive. See *Commonwealth* v. *Garrey*, 436 Mass. 422, 432-433 (2002) (evidence that defendant attacked rival for his girl friend's affections admissible to show that jealousy was motive for later killing of another rival). Immediately following Cruz's testimony concerning the October 17 incident, the judge gave an appropriate limiting instruction concerning the proper use of this evidence. There was no error.

b. *Rebuttal evidence.* The defendant objected to evidence, offered in rebuttal, of yet another prior bad act, namely, the June 5, 1993, incident in which the defendant had kicked in the door to Cruz's apartment while armed with a gun, and had threatened to kill her if he ever saw her with another man. At trial, the defendant objected on the ground that he was unfairly surprised by the introduction of this evidence. The judge overruled that

to intent and motive; and the evidence of the defendant's guilt was overwhelming.

[4]Cruz testified, and the defendant acknowledged, that the October 17 encounter was the first time that the defendant had seen Cruz with Tolentino.

objection, noting that the Commonwealth had no way of knowing in advance whether the defendant would testify or what he would say, and thus could not anticipate the need for particular rebuttal evidence. He further noted that, because the defendant had been arrested and charged in connection with the June, 1993, incident, and because the Commonwealth had promptly turned over police reports from that incident as soon as it knew the evidence would be offered in rebuttal, there was no unfair surprise. On appeal, the defendant now argues that this evidence was not proper rebuttal. We disagree, and we see no substantial likelihood of a miscarriage of justice from the admission of this rebuttal evidence.[5]

On direct examination, the defendant testified that he had no problem with Cruz's seeing another man, that he never kicked down Cruz's door, and that he had no motive to kill Tolentino; he also denied pulling a gun on Tolentino during the October 10 confrontation. On cross-examination, when asked whether he had pulled a gun on Tolentino, the defendant denied that he pulled a gun and then volunteered that he had never pulled or even walked around with a gun. He reiterated that he had never kicked in Cruz's door, because doing so "could have hit her in the face or something." To rebut this testimony, the Commonwealth recalled Cruz. Cruz testified that the defendant, on June 5, 1993, kicked in the door of her apartment after she refused to let him in. She saw a gun in the defendant's pants. Finally, she testified that the defendant threatened to kill her if he saw her with another man. After the Commonwealth's rebuttal evidence, the judge instructed the jury that they could consider this rebuttal testimony only for purposes of assessing the defendant's credibility as a witness or as it pertained to his motive and intent.

"Rebuttal is legitimate when it responds to the opponent's case; . . . the judge . . . has a nearly unreversible [*sic*] discretion to allow it." *Commonwealth* v. *Roberts*, 433 Mass. 45, 51 (2000), quoting *Commonwealth* v. *Johnson*, 41 Mass. App. Ct.

---

[5]The defendant does not pursue the claim that he was unfairly surprised by the Commonwealth's introduction of this evidence. Pursuant to our review under G. L. c. 278, § 33E, we conclude that the judge correctly overruled that objection.

81, 89 (1996). The rebuttal evidence here responded to the defendant's case. Extrinsic evidence that the defendant threatened to kill Cruz if he ever saw her with another man responded to the defendant's claim that he had no motive to kill Tolentino and no problem with Cruz's entering a relationship with someone else. Similarly, where the defendant claimed that he had never carried a gun (implying that he therefore could not have shot Tolentino), the Commonwealth properly introduced in rebuttal evidence that the defendant had carried a gun.

To the extent that these matters went to impeachment (as opposed to substantive issues in the case), judges have discretion to permit impeachment on collateral matters by extrinsic evidence offered in rebuttal. See *Commonwealth* v. *Ferguson,* 425 Mass. 349, 355 (1997), and cases cited. While we recognize that it is the "better practice" to exclude such evidence if it "bears on the defendant's character, thereby raising the danger of unfair prejudice," *id.* at 355 n.6, it remains within the judge's discretion. Here, while one might deem some aspects of the June, 1993, incident to be only collateral and hence going only to impeachment (e.g., the kicking in of the door), the same incident touched on matters of substance (i.e., the defendant's motive and his access to a gun). Furthermore, the judge's limiting instructions, given both at the end of the rebuttal testimony and again during his final instructions, minimized the risk of undue prejudice from the rebuttal testimony. While the defendant points out that those instructions failed to differentiate between rebuttal evidence that was probative of substantive issues and rebuttal evidence that only went to credibility, such a differentiation is not necessary (or even helpful) to reduce potential prejudice. As to *all* aspects of the rebuttal evidence, the instructions forcefully told the jurors not to treat it as evidence of the defendant's bad character.

c. *Ineffective assistance of counsel.* In his pro se brief, the defendant argues that his trial counsel was ineffective in failing to call one Julio Correa as a witness, in failing to pursue a theory of self-defense, and in failing to object to improper rebuttal evidence.

With regard to the last item, we have already ruled that the judge properly admitted the rebuttal evidence, and counsel's

failure to object to it as improper rebuttal was therefore of no consequence. As to failure to pursue a theory of self-defense, the defendant has not raised this issue on a motion for new trial. The record before us does not suggest that self-defense was a viable option. The witnesses testified that the victim had locked himself in the bedroom seeking to escape, with no evidence suggesting that the victim had threatened or provoked the shooters. Rather, the defendant and his companions were the intruders and instigators of the deadly confrontation, and thus cannot claim self-defense. See *Commonwealth* v. *Morgan*, 422 Mass. 373, 383 (1996) ("right of self-defense ordinarily cannot be claimed by a person who provokes or initiates an assault"). Finally, a claim of self-defense would have been inconsistent with the defense that counsel raised (the theory that the defendant had been misidentified). With respect to the failure to call Correa to testify, that claim has also not been the subject of a new trial motion, and the defendant's attempt to raise it on appeal relies on materials that are not part of the record.[6]

d. *Missing witness instruction.* The defendant argues that the judge gave an improper missing witness instruction when he told the jury, during a discussion of scheduling, that there was a "possibility" that more witnesses would be called. (As it turned out, three more witnesses did testify the day after the judge advised the jury of this "possibility.") We do not see how that remark could have prejudiced the defendant, and the comment did not constitute a missing witness instruction. Cf. *Commonwealth* v. *Thomas*, 429 Mass. 146, 149 n.1 (1999) (missing

---

[6]We note, however, that the materials that the defendant submitted are fatal to this theory of ineffective assistance. Whatever benefit the defendant hoped to gain from Correa's testimony was defeated by Correa's statement to agents of the Federal Bureau of Investigation (FBI) in which he admitted his own participation in the attack and identified the defendant, by his nickname, as one of a group of fellow gang members who killed Tolentino. At trial, defense counsel made clear that he did not want to call Correa as a witness, but he was seeking material from the FBI with which to impeach Correa if the Commonwealth called him to testify. An attorney's tactical decisions constitute ineffective assistance of counsel only if they were manifestly unreasonable when made. *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). When pursuing a defense of mistaken identity, it is not manifestly unreasonable for defense counsel to avoid calling a witness who would identify the defendant as one of the shooters and whose testimony would potentially raise the subject of the defendant's gang involvement.

witness instruction advised jury that they could draw inference that testimony of witness who did not testify would have been unfavorable to particular party).

e. *Sufficiency of the evidence.* The defendant contends that the evidence was not sufficient to convict him of murder. Without repeating the details, there was abundant evidence that the defendant intentionally killed Tolentino, without justification, having resolved to kill him at least one week prior to the actual shooting.[7] Indeed, the Commonwealth presented overwhelming evidence of the defendant's guilt of murder in the first degree on a theory of deliberate premeditation. Where the evidence was sufficient to convict the defendant of murder in the first degree on the basis of deliberate premeditation, we need not consider whether the evidence was also sufficient to convict him on the theory of felony-murder.[8]

The defendant also contends that the evidence was insufficient to support a conviction of armed home invasion. In order

---

[7]The evidence was sufficient for the jury to conclude that the defendant fired at least one of the bullets that struck Tolentino, and that he fired simultaneously with another armed assailant who entered the apartment with him. Accordingly, the evidence supported the verdict on a theory of joint venture, which was the sole theory argued by the Commonwealth and submitted to the jury. The jury were not required to conclude that the defendant fired the fatal shot. See *Commonwealth* v. *Ellis*, 432 Mass. 746, 761 (2000), and cases cited.

[8]The predicate felony (armed home invasion) could not serve as the basis for a felony-murder conviction unless it was "separate from the acts of personal violence which constitute a necessary part of the homicide itself." *Commonwealth* v. *Gunter*, 427 Mass. 259, 272 (1998), quoting *Commonwealth* v. *Quigley*, 391 Mass. 461, 466 (1984), cert. denied, 472 U.S. 1115 (1985). To satisfy that requirement, the Commonwealth now contends that the defendant's confrontation with Santos immediately after the shooting of Tolentino constituted a threat of the imminent use of force on her, and that the elements of armed home invasion were thus established independent of the killing of Tolentino. See *Commonwealth* v. *Gunter*, *supra* at 273-274 (predicate felony of armed assault in dwelling did not merge with homicide where perpetrators assaulted other victims in apartment). Assuming that there was sufficient evidence of a threat of force against Santos, the Commonwealth did not argue such a theory to the jury, and the jury were not instructed on the need to find an assault on some victim other than Tolentino. It appears quite possible, and indeed likely, that the jury relied on the assault on Tolentino to satisfy the elements of armed home invasion and thereby felony-murder. Because of this defect in the instructions, the conviction on a theory of felony-murder would not survive a merger analysis.

to prove armed home invasion, the Commonwealth had to establish beyond a reasonable doubt that the defendant (1) "knowingly enter[ed] the dwelling place of another"; (2) "knowing or having reason to know that one or more persons [were] present within"; (3) "while armed with a dangerous weapon"; and (4) "use[d] force or threaten[ed] the imminent use of force upon any person within such dwelling place whether or not injury occur[red], or intentionally cause[d] any injury to any person within such dwelling place." G. L. c. 265, § 18C. Viewed in a light most favorable to the Commonwealth, the evidence established that the defendant and his cohorts, while armed and knowing that people were present in Cruz's apartment, intentionally entered the apartment and shot Tolentino. Where, as here, the jury have specified an alternate theory of murder in the first degree (deliberate premeditation), conviction of an underlying felony is not duplicative of the murder conviction. See *Commonwealth* v. *Jackson,* 428 Mass. 455, 467 (1998), and cases cited. As such, the conviction of armed home invasion remains as a "separate and distinct crime[]." *Id.*

f. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record as required by G. L. c. 278, § 33E, and conclude that there is no basis for ordering a new trial or directing the entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*