Sikora, J.
MEMORANDUM
Factual and Procedural Background
1. (a) Richard York. In 1965 the respondent York was convicted of open, gross and lewd behavior (G.L.c. 272) and received a three-year suspended sentence. In 1984 he was convicted of aggravated rape (G.L.c. 265, §22; c. 277, §39) and received a 15-to-20-year sentence. He was scheduled for release from the South Eastern Correctional Center at Bridgewater on December 16, 2001. On December 12, 2001, pursuant to G.L.c. 123A, §§1 and 12-16, as amended by St. 1999, c. 74, §§3-8, the District Attorney for Norfolk County filed a petition for commitment of York as a sexually dangerous person and for temporary detention pending a probable cause hearing. In accordance with G.L.c. 123A, §12(c) and (d), York presently confronts a hearing to determine whether probable cause exists for the belief that he is a sexually dangerous person.
(b) York has taken the position that at the probable cause hearing he will submit evidence from an independent qualified examiner of his selection (“the private examiner”); and that the private examiner will offer expert testimony and written psychological test results upon York’s status. The private examiner will have derived his opinion testimony and test results in substantial part from his interview and evaluation of York.
(c) Consequently the District Attorney has moved to exclude the evidence of the private examiner, or alternatively to order York to submit to examination and to resulting evidence from the Commonwealth’s selected qualified examiner at the probable cause hearing.
2. (a) Roger Youmans. In 1993 Youmans pleaded guilty to eight counts of indecent assault and battery on a child (G.L.c. 265, §13B) and to two counts of rape of a child (G.L.c. 265, §23). He received a sentence of 5-to-10 years upon one charge of rape of a child and suspended 5-to-10 year sentence with probation to February 24, 2007, upon the second such charge. Upon the eight counts of indecent assault and battery of a child he drew a 5-to-10 year prison sentence concurrent with the first rape-of-a-child sentence. He was scheduled for release from MCI-Gardener on November 30, 2001. On that day the District Attorney, pursuant to G.L.c. 123A, §§1 and 12-16, as amended, filed a petition for commitment of Youmans as a sexually dangerous person. Youmans is awaiting a probable cause hearing under G.L.c. 123A, §§ 12(c) and (d).
(b) Youmans, too, takes the position that at the probable cause hearing he will submit the testimony and test results of his chosen private examiner. That examiner will offer evidence acquired from his interview and evaluation of Youmans.
*69 (c) The District Attorney has answered with the same motion: that Youmans cannot offer the evidence of the private examiner at the probable cause hearing unless he submits to examination by, and evidence from, the Commonwealth’s qualified examiner.
The Respondents’ Claim of the Privilege Against Self-Incrimination.
The respondents assert the same contention: that the privilege against self-incrimination embodied in Part I, Article 12, of the Declaration of Rights of the Massachusetts Constitution bars the involuntary evaluation of them by the Commonwealth’s examiner because such an examination could extract from them incriminating testimonial evidence. (Opposition Memorandum of each respondent at 3-4):
The psychological interview proposed by the Commonwealth calls upon the Respondent to recite his life history, emotions, feelings, thoughts and views as to relations with others, but more importantly, to render the examination completely effective, he may well have to talk about other crimes charged or uncharged as well as acts, events and emotions relative to said crimes’ commission. From this, it is clear that any order the Respondent fully cooperate with the examiner may well result in disclosure of significant information which will constitute either a full confession of uncharged crimes or result in admissions which may be probative as to those acts. In addition, such statements may provide leads, heretofore unavailable to law enforcement which will lead to the discovery of other inculpatory evidence. At a minimum, such statements may provide a basis for the impeachment of Respondent.
Just as significantly, the result of such a compelled examination will result in the Respondent putting into the hands of the government crucial evidence necessary to his involuntary confinement, evidence as to his mental capacity which goes to the essential part of the government’s case against him in its effort to establish the requisite mental abnormality or personality disorder. The statutoiy scheme presented by the legislative amendments of 1999 to c. 123A presumptively excluded the intrusive inquiry requested by the Commonwealth in its motion. Psychiatric expert testimony based on the Respondent’s compelled statements clearly would be the “fruits” of such compelled testimonial communication and an invasion of his most precious right to privacy, his thoughts.
At the court’s request the District Attorney has furnished the following outline of the subjects intended for coverage by the Commonwealth’s examiner in the course of an interview of York and Youmans: Developmental history with a focus on physical/sexual abuse
Sexual history
Medical-Psychiatric history
Substance abuse history
Education history
Vocational history
Interpersonal/Marital history
Military/Weapons history
Criminal history (juvenile and adult, sexual and non-sexual)
Age at first offense
Number and type of offenses
Number, gender, and age of victims
Degree of violence employed
Behavior while incarcerated, including disciplinary reports
Sex Offender treatment history:
Does the offender:
deny or accept responsibility for offenses? understand the factors that led to the offense? understand the role of disinhibitors? appreciate the short and long-term effect of
his actions on the victim(s)?
Has the offender:
addressed his deviant arousal?
looked at cognitive distortions?
developed a Relapsed Prevention Plan?
established a realistic Release Plan?
To the resulting information the examiner will apply certain “actuarial tools” or behavioral formulae designed to assist a determination of the probability of recidivism or reoffense by the respondent. The questioning by the independent examiner (also known as “a sexually dangerous person evaluator” or “SDP evaluator”) is retrospective. It addresses the history of the respondent, including the offenses for which he has incurred conviction and confinement. The resulting evaluation is prospective. It attempts to measure the probability of relapse.
Discussion
1. The Civil-Criminal Distinction.
By its terms Article 12 applies to criminal proceedings (emphasis supplied): “No subject shall be held to answer for any crimes or offense until the same is fully and plainly, substantially and formally, described to him; or be compelled to accuse, or furnish evidence against himself.” Proceedings under the G.L.c. 123A, §§1, 8-12, codifying the sexually dangerous person amendments of 1999, are civil in nature. Commonwealth v. Bruno, 432 Mass. 489, 499-02 (2000) (rejecting the application of the constitutional prohibition against ex post facto legislation upon grounds of the amendments’ civil remedial character). While the anal *70 ysis of the four dissenting Justices in Kansas v. Hendricks, 521 U.S. 346, 373-98 (1997), may raise serious doubts about that characterization of indeterminate sexually-dangerous-person commitments, those doubts do not affect the present analysis. Well before Hendricks the Supreme Judicial Court had warned that “the civil-criminal distinction cannot be applied blindly to deny constitutional rights” to persons targeted for indefinite civil confinement as sexually dangerous. Commonwealth v. Travis, 372 Mass. 238, 246 (1977). In an abundance of caution it has regarded “such persons [as] plainly entitled to certain minimum standards of procedural due process ... In certain circumstances it has been assumed that one in custody... under c. 123Ahas rights under the Fifth Amendment including the right to receive the warnings articulated in Miranda v. Arizona, 384 U.S. 436 (1966).” Commonwealth v. Lamb, 365 Mass. 265, 270 (1974). These, of course, would include the warning of the right to remain silent.
Consequently the analysis of the respondents’ position begins with the assumed application of the privilege against self-incrimination embodied in Article 12. The decisive question becomes the scope of the right amid the new procedure. The respondents’ contention has not yet produced a published appellate answer. However, several strong analogies are available from cases at both the appellate and trial levels. These have produced a rule for the use of compulsory mental evaluations compatibly with the constitutional right against self-incrimination.
2. The Policy of Parity for the Purpose of Accurate Factfinding.
(a) The Analogous Setting of Mental Impairment Defenses to Criminal Charges.
In cases in which an accused raises a defense of mental impairment and lack of criminal responsibility and in which he intends to submit supportive expert evidence, the court sua sponte or at the initiative of the prosecution “may order the defendant to submit to a psychiatric examination consistent with the provisions of the General Laws . . .” Mass.R.Crim.P. 14(b)(2)(B)(iv). The rule goes on:
[I]f a defendant refuses to submit to an examination ordered pursuant to and subject to the terms and conditions of this rule, the judge may prescribe such remedies as he deems warranted by the circumstances, which may include exclusion of the testimony of any expert witness offered by the defendant on the issue of his mental condition . . .
As the District Attorney points out, this provision codified the holding of Blaisdell v. Commonwealth, 372 Mass. 753, 768-69 (1977), in which the court authorized the trial judge to order psychological testing of the defendant asserting mental incapacity and to preclude the use of the defendant’s expert evidence based on his statements to his examiner if he refused to submit to the court-ordered evaluation. With appropriate safeguards the trialjudge could per mit use of the court-or dered non testimonial evalu - ationresultsbytheprosecutionattrial.fd. at 768-69.
The purpose of this balanced mechanism was accurate factfinding. In these circumstances “there would be no violation of (the accused’s] privilege [against self-incrimination] should the court order him ... to submit to psychiatric examination so that the jury may have the benefit of countervailing expert views, based on similar testimonial statements of a defendant in discharging its responsibility of making a true and valid determination of the issues thus opened by a defendant [authorities collected].” Id. at 766. The operation of this evidentiary parity does not violate the constitutional privilege. It simply puts the accused to a choice of its use. He can guard it strictly and forego the use of some expert evidence. Or he can submit to an unchosen evaluation in exchange for the submission of his preferred evaluation results at trial.
It is important to remember that the operation of parity does not directly invade the zone of constitutionally privileged testimonial information. “To the extent that a psychiatric report filed with the court contains both privileged and nonprivileged matter, the court may, at such time as it deems appropriate, allow disclosure of only the nonprivileged aspects thereof, if feasible.” Blaisdell at 768. So, too, Mass.R.Crim.P. 14(b)(2)(B)(ii): “No statement, confession, or admission, or other evidence . . . except evidence derived solely from physical or psychological observations or tests, may be revealed to the prosecutor . . . unless so ordered by the judge.”
The Supreme Judicial court has applied the terms of Blaisdell and Rule 14(b)(2)(B) to both the insanity defense and to claims of lack of criminal responsibility by reason of alternate forms of mental impairment. Commonwealth v. Diaz, 431 Mass. 822, 828-30 (2000) & n.6 (collecting cases from other jurisdictions enforcing the same rule and purpose of reciprocal discovery and accurate factfinding). The trial court must continue to safeguard against any threatened violation of Article 12. Id. at 829. The Superior Court has similarly applied Blaisdell and Rule 14 procedure to the defense of the lack of specific intent to commit murder by reason of intoxication. Commonwealth v. Holland, Norfolk Superior Court Nos. 106415-106416 (Memorandum of Decision dated March 28, 2000, per Connolly, J.) (11 Mass. L. Rptr. 511).
(b) The Analogy of Juvenile Transfer Proceedings.
A separate and converging rationale emerged from the statutory process for transfer of underage respondents from the juvenile justice system to criminal prosecution in the Superior Court. Under the pre1996 legislation of G.L.c. 119, §61, Part B, the Commonwealth could transfer a juvenile to prosecution in the Superior Court by means of an adversarial pro *71 ceeding In which it carried the burden to show (a) that the juvenile constituted a danger to the public, and (b) that he was not amenable to rehabilitation in the juvenile system. Those determinations, especially the nonamenability finding, typically required evaluation and expert testimony from psychologists or psychiatrists.
In the case of Wayne W., 414 Mass. 218 (1993), the juveniles retained private experts and intended to offer their resulting evaluations at the hearing; but refused to submit to separate court-ordered evaluations requested by the prosecution. The juveniles argued that the court-ordered examination would violate their rights against self-incrimination. Id. at 226-27. The court concluded that the constitutional privileges of the Fifth Amendment and of Article 12 applied, "but that the defendants, if they voluntarily choose to offer expert psychiatric evidence, can be ordered to participate in an examination by a Commonwealth expert.” Id. at 227-28. The reason was the same: to prevent “the distorting effect on the fact finder’s role, if only one party can introduce expert testimony on a crucial issue [authorities collected].” Id. 231.
(c) Civil Petition for the Discharge of Sexually Dangerous Persons.
Finally, in the analogous setting of a civil petition under G.L.c. 123A, §9, for examination and discharge of a sexually dangerous person committed under former G.L.c. 123A, §§3 — 6 (repealed by St. 1990, c. 150, §304, effectively as of September 1, 1990), the Supreme Judicial Court has rejected an applicant’s argument that he may decline to submit to evaluation (including interviews) by the mandated two court-appointed examiners by reason of the patient-psychotherapist privilege of G.L.c. 233, §20B. A person refusing to be interviewed will suffer the dismissal of his petition in accordance with the command of §9. Sheridan, Petitioner, 412 Mass. 599, 604-05 (1992).
The reliable determination of sexual dangerousness and the resulting protection of the community are weighty statutory goals. Their gravity is enough to put the applicant to the choice between a contribution to accurate determination of his status on the one hand; and the maintenance of his statutory privilege of patient-psychotherapist privacy at the cost of his release from civil commitment, on the other. Sheridan at 604-05. Here, again, it bears emphasis that the purpose of the dangerousness evaluation is the determination of a post-sentence behavioral status and not the prosecution of a criminal accusation. Bruno, 432 Mass. at 497-99; and G.L.c. 233, §20B(b) [waiver of patient-psychotherapist privilege will still not result in the admissibility of criminal confession or admission).
The Superior Court in a pertinent decision has extended that holding to circumstances in which the petitioner refuses the court-ordered interview and attempts to substitute the evaluation of his private examiner. The result is dismissal of the petition under c. 123A, §9. Alvarrado v. Commonwealth, Middlesex Superior Court SDP No. 190 (Ruling and Order dated November 13, 1998 per Hamlin, J.).[1]
3. Waiver
The principle of waiver furnishes an independent basis for the same conclusion: that a dangerousness or SDP respondent under the 1999 amendments cannot simultaneously offer the evidence of his own examiner and invoke the privilege against self-incrimination to preclude evaluation and testimony by the Commonwealth examiner. Both the Blaisdell and Wayne W. courts concluded that the accused’s offer of his own examiner’s expert evidence constituted a waiver of the privilege and exposed him to examination and testimony of the prosecution’s expert. Blaisdell, 372 Mass. at 766: “If... a defendant voluntarily submits to psychiatric interrogation as to his inner thoughts, the alleged crime and other relevant factors bearing on his mental responsibility and, on advice of counsel, voluntarily proffers such evidence to the jury, . . . the offer of such expert testimony based in whole or in part on a defendant’s testimonial statements constitutes a waiver of the privilege for such purposes.” Similarly in Wayne W., 414 Mass. at 230, the court observed that the juveniles could not enjoy a one-sided presentation of expert examination evidence. “It is a basic principle of constitutional law that a defendant who speaks on his own behalf thereby gives up his privilege of silence and may be compelled to respond to questions posed by the State on matters reasonably related to the subject matter of his own testimony [cases cited].” See also, and generally, Harris v. New York, 401 U.S. 222, 226-27 (1971) (a defendant entitled to the exclusion from the prosecution’s case-in-chief of post-arrest self-incriminating statements for reason of the omission of his Miranda warnings effectively waived that constitutional protection when he took the stand and offered exculpatory testimony inconsistent with his post-arrest comments; he had opened his credibility to impeachment by the previously excludible statements).
In Blaisdell, Wayne W., and the present cases, the material circumstance is essentially the same: the respondent is offering testimony through the conduit of a preferred examiner; and blocking potentially responsive testimony upon the same subject of sexual dangerousness from the conduit of the government’s examiner. The respondent is breaking his silence through the persona, or mask, of the private examiner. He cannot simultaneously break his constitutional entitlement to silence and yet maintain its benefits against the Commonwealth.
York and Youmans raise an issue concerning the timing of any waiver of the Article 12 privilege. They *72 say that they do not effectively waive it until the moment at which they take the stand and offer testimony; and therefor e that they should not prematurely be compelled to provide potentially adverse evidence totheCommonwealth.(OppositionMemorandaatlO.) They accurately cite some language from Blaisdell, 372 Mass. at 764: “The mere fact that a defendant gives notice of an intention to interpose a defense of insanity cannot be construed as a waiver of his privilege against self-incrimination for a waiver of that privilege comes about in the context of a criminal trial only when the defendant takes the stand to give testimonial evidence in his own behalf.”
However subsequent Blaisdell language shrinks that statement into the practical necessities of trial preparation upon an issue of mental condition. Id. at 767.
To require the Commonwealth to wait until a waiver normally occurs may well cause it to be disadvantaged in meeting the issues raised by a defendant’s evidence by virtue of the fact that its expert witnesses will lack adequate time to examine properly a defendant and his evidence in order to prepare for trial. Alternatively , a continuance of the trial may cause needless expense to the Commonwealth, unnecessary inconvenience to the court and to the jurors, and disruption of the progress of the trial which may cause harm to either the prosecution or the defense. To require the Commonwealth to wait until such a waiver occurs at trial seems not only inexpedient and unwise but also unnecessary.
The court made the same point in Wayne W., 418 Mass. at 233. “The judge, on motion by the Commonwealth or by his own order, may direct the juvenile to disclose whether he intends to offer such evidence. Disclosure should be sufficiently in advance of the hearing to permit the Commonwealth to conduct its own examination.” Here, again, reliable factfinding requires adequate preparation of expert evidence on both sides.
4. Statutory Construction: The 1999 Legislative Omission of an Examination Process at the Probable Cause Stage.
Finally York and Youmans raise an issue of statutory construction. In the 1999 amendments the Legislature specifically included under revised c. 123A, §§9 and 13(a), a process for evaluation by two qualified examiners. It commanded the respondent to submit to the examination “including personal interviews.” It sanctioned the refusal “without good cause” of such an interview with the dismissal of the request for release upon motion of the Commonwealth, §9. This requirement operated during the period of commitment of up to 60 days after a probable cause finding, § 13(a), and prior to a trial or dispositive hearing, §9.
No comparable examination-and-interview process appears in the legislation governing the procedure up to and through the earlier phase of probable cause determination. C. 123A, §§ 12(c), (d). York and Youmans interpret the omission to be purposeful, and to indicate that the Legislature did not intend the use of Commonwealth examiners at the earlier probable cause stage. (Opposition Memoranda at 11-13.)
The 1999 amendments make no mention of the use of examiners at the probable cause hearing. If they had authorized their availability for the respondent but omitted reference to them for use by the Commonwealth, the respondents’ reasoning might have force: that the inclusion of examiners for one purpose meant their exclusion for another. However the 1999 legislation is silently neutral about their use by any party in the probable cause process.
In these circumstances I would infer that parity should apply at the probable cause stage to the same extent as it does at the climactic hearing stage. Several reasons lead to that conclusion. First, parity is inherently fair to the contestants; it favors neither. Second, it leads to more reliable factfinding and therefore to the necessary protection of the community or to the warranted release of the respondent. Third, and relatedly, the goal of accurate factfinding of probable cause is as important as the goal of accurate factfinding for final adjudication. If the probable cause determination miscarries as the result of disparate access to expert evidence and causes the discharge of a sexually dangerous person, it precludes all further adjudication. The Legislature could not plausibly have intended to construct a careful and evenhanded final evidentiary hearing upon a compelling subject, and yet exposed that proceeding to elimination by an earlier uneven process of far less quality and reliability.
CONCLUSION
For these reasons the respondents York and Youmans cannot, at their probable cause hearings under G.L.c. 123A, §§12(c), (d), offer expert evidence from a private examiner unless they have submitted to evaluation and potential evidence from a Commonwealth examiner.

The District Attorney has pointed out that the policy of parity operates in general civil litigation under Fed.R.Civ.P. 35(a) [and by implication under the similarly worded Mass.R.Civ.P. 35(a)]. Under the rule, the trial court may order an examination and evaluation of the physical and mental condition of person at issue for “good cause shown. ” One such cause can be the equal access of the parties to important evidence. See especially Duncan v. Upjohn Co., 155 F.R.D. 23, 25 (D.Conn. 1994); Tomlin v. Holecek, 150 F.R.D. 628, 630 (D.Minn. 1993).