COMMONWEALTH vs. JOHN ANTHONY DIAZ.

Norfolk. April 7, 2000. - June 23, 2000.

Present: MARSHALL, C.J., ABRAMS, IRELAND, & SPINA, JJ.

*Extradition and Rendition. Mental Impairment. Homicide. Practice, Criminal,* Instructions to jury, Capital case. *Words,* "Deportation."

There was no merit to a criminal defendant's claim that his right to due process was violated such that a murder indictment against him should be dismissed because he came into custody of the United States through deportation rather than extradition [826-827] or on account of any defects in the deportation process [827-828].

This court concluded that in a murder case in which the defendant raised a claim, and sought to use expert evidence to establish, that his mental impairment affected his ability to commit murder with deliberate premeditation, the judge, in accordance with the procedures set forth in Mass. R. Crim. P. 14 (b) (2) (B) (i)-(iv), properly ordered reciprocal discovery and that the defendant undergo examination by a court-appointed psychiatrist. [828-830]

Where, at a murder trial, there was no basis in the evidence for an instruction on voluntary manslaughter, the judge did not err in refusing to so instruct; and where the evidence demonstrated that the risk of harm associated with the defendant's actions was nothing less than a plain and strong likelihood that death would follow, an instruction on involuntary manslaughter was not required. [830-831]

No reason appeared on the record of a murder trial for this court to reduce the degree of guilt or grant a new trial. [831-832]

INDICTMENT found and returned in the Superior Court Department on August 4, 1993.

A motion to dismiss was heard by Elizabeth Butler, J., and the case was tried before her.

*Stephen Neyman* for the defendant.

*Robert C. Cosgrove,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. The defendant, John Anthony Diaz, was convicted of murder in the first degree on a theory of deliberate premeditation. On appeal, he claims that the trial judge erred in (1) denying his motion to dismiss the indictment based on the Republic

of Guyana's deportation of him before extradition proceedings were completed; and (2) the handling of the defendant's mental impairment defense in (a) ordering him to submit to a psychiatric examination when he proposed offering expert testimony regarding his inability to commit the murder with deliberate premeditation; and (b) refusing to instruct the jury on manslaughter. After considering these arguments and reviewing the entire record pursuant to G. L. c. 278, § 33E, we see no reason to grant the defendant a new trial or reduce the degree of guilt. Accordingly, we affirm the conviction.

We summarize the evidence in the light most favorable to the Commonwealth. See, e.g., *Commonwealth* v. *Gilbert*, 423 Mass. 863, 864 (1996). On July 10, 1993, the victim attended her sister's bridal shower at their mother's home in Quincy. That evening, the victim went out for refreshments and ice cream with her boy friend and her teenage nephew. When the three returned to the Quincy home at approximately 11 P.M., the defendant approached them, stood approximately one foot away from the victim, pointed a gun at the victim's head, called out her sister's name, and fired. As the evidence would show, the victim's sister had previously broken up with the defendant. He apparently shot the victim because he mistook her for her sister. The victim later died from the gunshot wound. The weapon used was a Glock nine millimeter handgun, and the ammunition was the "Black Talon" variety. The victim's boy friend and nephew later identified the defendant as the shooter from a photographic array.

Two years before the shooting, in the summer of 1991, the defendant met and started dating the victim's sister. The victim's sister visited the defendant on Cape Cod where the defendant lived with his mother and at Springfield College, where he was a student. Beginning in the spring of 1992, the victim's sister and the defendant saw less of each other. She told the defendant that she did not want to continue their romantic relationship, but would like to remain his friend. In May of 1992, the victim's sister met her future husband. In September of 1992, she started a job in New York City and moved to New Jersey. Later that month, the defendant telephoned her. While at first the conversation was pleasant, when the victim's sister told him that she was dating someone else, the defendant called her a "fucking bitch" and hung up the telephone.

Shortly thereafter, the defendant took a number of steps to

secure an alternative identity. From records in a local library, the defendant obtained the vital statistics of a deceased child, who, had he lived, would have been the same age as the defendant. In early 1993, the defendant obtained a copy of the child's birth certificate, and applied for and received a Maine liquor identification card, a Maine driver's license, a social security card, and a passport under this alias.

While the defendant was applying for false identification papers, he also applied for and received a Rhode Island driver's license in his own name. The defendant had a conversation with a friend about firearms and "man-stopping" ammunition. This friend told him about Winchester Black Talon ammunition, and showed the defendant his own Glock .40 caliber semiautomatic handgun. On May 11, 1993, the defendant purchased a Glock nine millimeter handgun and Black Talon ammunition using his Rhode Island driver's license.

After shooting the victim on July 10, 1993, the defendant fled the scene and drove his vehicle to John Fitzgerald Kennedy International Airport in New York City. Using the false passport and $10,000 he had obtained from credit cards, the defendant boarded a flight, and eventually arrived in Kuala Lumpur, Malaysia. On July 13, 1993, from his hotel room in Malaysia, the defendant telephoned a friend who lived in Hyannis, Massachusetts, and asked whether he (the defendant) had killed his former girl friend. The friend told the defendant that he thought that the defendant had killed her sister instead. The defendant then told his friend that he (the defendant) was not "fit to live," and said, "I'll never see you again." The defendant left Malaysia and traveled though several countries before arriving in the Republic of Guyana on September 30, 1993. Working for an advertising company and marrying a local woman, the defendant remained in Guyana until his arrest in 1996, the relevant circumstances of which are described below.

At trial, the defense focused on presenting evidence of the defendant's mental impairment, which he contended prevented him from committing the shooting with deliberate premeditation. The defendant testified that, after he learned that the victim's sister was dating someone else, he became depressed, did not return to school, quit his job as a physical therapy aide, and was contemplating suicide. In the spring of 1993, the defendant told a friend that he thought the breakup with the victim's sister was caused by her father's racism. The defendant

told his friend that "everyone expected a black guy to be the bad guy," and that "no one knew what he was capable of doing." Other friends testified that, during this period, the defendant stopped socializing and he failed to return telephone calls. The defendant's mother testified that, from January, 1993, to the time of the murder, the defendant rarely left their home. A psychiatrist testified that, at the time leading up to the shooting, the defendant was suffering from severe depression that left him unable to think rationally and prevented the defendant from deliberately premeditating the killing.

1. *Guyana's deportation of the defendant and his return to Massachusetts.* The defendant argues that his motion to dismiss the indictment should have been granted because he was deported from Guyana before that country had completed extradition proceedings, and because Massachusetts law enforcement officials allegedly abducted him from that country. The motion judge denied the defendant's motion to dismiss, concluding that the Superior Court had jurisdiction over the defendant and that, accordingly, the case against the defendant could proceed. We set out the facts relevant to this issue as found by the motion judge. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990).

In March of 1996, as a result of an anonymous tip, the Massachusetts State police discovered that the defendant was in Guyana and notified the Guyanese authorities of his presence in the country. On March 22, 1996, after obtaining an arrest warrant, Guyanese police officers took the defendant into custody. On March 23, 1996, two Massachusetts State police officers flew to Guyana to interview the defendant, who invoked his right to counsel.[1] A local attorney was appointed to represent the defendant, and extradition proceedings commenced.

On March 25, officials from the Immigration Department of Guyana filed a separate application for deportation of the defendant pursuant to § 28 of Guyana's Immigration Act. On that same day, the defendant's local attorney applied for, and received, an injunction from a Justice of the Supreme Court of Judicature of Guyana that restrained the Attorney General of Guyana and the commissioner of police from expelling "Greg Grayson" (the defendant's alias) until completion of the extradi-

---

[1]The defendant signed his true name, John Diaz, on the Miranda warnings card.

tion proceedings. The injunction was extended and remained in effect until 11 A.M. on April 22.

Meanwhile, a magistrate of the Georgetown magisterial district of Guyana conducted an evidentiary hearing on the deportation application during which witnesses testified as to the defendant's true identity. At the hearing, the defendant was represented by counsel. Following this hearing, on April 19, the magistrate found that the defendant had entered Guyana on a false passport. He ordered that John Diaz, the defendant, be removed from Guyana.

In the early morning of April 22, 1996, Guyana law enforcement officials transported the defendant to the airport and turned him over to the custody of officials from the Massachusetts State police. They then boarded a flight to Miami. During a stop in Trinidad, the defendant attempted to flee, but was apprehended by either a State trooper or an airport security officer. He was placed in restraints at the request of the airline. The defendant was then returned to Massachusetts, where he was arraigned on the murder charge.

The essence of the defendant's claim is that, because Guyana deported him rather than rendering him through extradition proceedings,[2] he did not receive the process he was entitled to under the treaty between the United States and Guyana. Implicit in his argument is the suggestion that the deportation proceeding afforded less process than would an extradition proceeding. See Extradition Treaty between the United States and the United Kingdom, effective in Guyana by means of succession, June 24, 1935, 47 Stat. 2122; T.S. No. 849. Therefore, the defendant argues, the Massachusetts court lacked jurisdiction over him. Extradition treaties are given the force of Federal statutes, see *United States* v. *Rauscher*, 119 U.S. 407, 418-419 (1886), and, although this type of jurisdictional argument has not been addressed by a Massachusetts court, there is ample Federal precedent.

Assuming, without deciding, that the injunction prohibiting the defendant's removal was in force, and, further, that the deportation proceedings employed provided less procedure than

---

[2]"Deportation" is the "removal or sending back of an alien to the country from which he came . . . without any punishment imposed," Black's Law Dictionary 438 (6th ed. 1990), whereas extradition involves the surrender of an individual accused or convicted of certain crimes to another jurisdiction. See *id.* at 585; 18 U.S.C. §§ 3181 et seq.

a Guyanese extradition hearing would have, the defendant's argument still fails. The purpose of an extradition treaty is to facilitate the apprehension of fugitives across international borders, while, at the same time, protecting the territorial sovereignty of other nations. The treaty at issue in this case "does not purport to limit the discretion of the two sovereigns to surrender fugitives for reasons of comity [or] prudence." *United States* v. *Najohn*, 785 F.2d 1420, 1422 (9th Cir.), cert. denied, 479 U.S. 1009 (1986). As stated by the United States Court of Appeals for the First Circuit, "[n]othing . . . prevents a sovereign nation from deporting foreign nationals for other reasons and in other ways [than those provided in the treaty] should it wish to do so." *United States* v. *Cordero*, 668 F.2d 32, 37 (1st Cir. 1981). See *United States* v. *Martinez*, 755 F. Supp. 1031, 1036 (N.D. Ga. 1991) (Colombia could surrender its nationals using other processes than those described in extradition treaty).

Furthermore, as extradition treaties are made for the benefit of the nations involved, only the foreign government has standing to assert a flaw in the extradition proceedings. See *id.* See also *United States* v. *Cordero*, *supra* at 37-38; *United States ex. rel. Lujan* v. *Gengler*, 510 F.2d 62, 67 (2d Cir.), cert. denied, 421 U.S. 1001 (1975). Any claims by the defendant are necessarily derivative of Guyana's claims. Here, there is no evidence in the record to suggest any protest on behalf of Guyana. Indeed, it was Guyana's authorities who deported the defendant.

The defendant also argues that the Massachusetts court should divest itself of jurisdiction because he was "abducted" from Guyana by the Massachusetts State police, and because the Massachusetts police treated him in an "egregious" manner. The motion judge declined to rule on the question whether the defendant had been abducted. Rather, the motion judge found that the Guyanese authorities turned the defendant over to the Massachusetts State police at the airport as they expelled the defendant from their territory. Any defects in either the extradition or deportation process were due to matters internal to Guyana's government and had nothing to do with the Massachusetts State police. In these circumstances, the defendant's rights were not violated. See *Frisbie* v. *Collins*, 342 U.S. 519, 522 (1952) ("[n]othing in the Constitution . . . requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will"); *Ker* v. *Illinois*, 119 U.S.

436 (1886). See also *United States* v. *Alvarez-Machain,* 504 U.S. 655, 662-666 (1992).

As for the purportedly "egregious" conduct of the Massachusetts State police, the record shows that the defendant was unrestrained until he attempted to flee in the Trinidad airport. There is no showing of the type of force or coercion that would require a court to divest itself of jurisdiction. See, e.g., *United States* v. *Toscanino,* 500 F.2d 267, 275-276 (2d Cir. 1974) (holding that criminal process would be abused by trial of Italian citizen allegedly brought to this country after being tortured). The motion judge correctly denied the defendant's motion to dismiss, and the case was properly before the court.

2. *The defendant's mental impairment defense.* The defendant raises several claims of error in regard to the trial judge's handling of his defense that his severe depression precluded him from deliberately premeditating.

(a) *Court-ordered psychiatric examination.* Less than one week before the start of trial, defense counsel notified the Commonwealth of his intention to call an expert witness to testify that the defendant's mental condition had affected his ability to commit a murder with deliberate premeditation. In response, the prosecution filed a motion seeking the disclosure of psychiatric records and for the appointment of a psychiatrist to examine the defendant. The judge granted the Commonwealth's motion.[3] The defendant argues that the judge lacked the authority to order an interview with a psychiatrist, as the defense was not lack of criminal responsibility, but rather the defendant's inability to premeditate.[4]

In *Blaisdell* v. *Commonwealth,* 372 Mass. 753, 766-769 (1977), we held that a judge could order a psychiatric examina-

---

[3]The defendant filed a petition pursuant to G. L. c. 211, § 3, seeking relief from the trial judge's order prohibiting him from presenting expert testimony on his mental impairment until the Commonwealth had an opportunity to conduct its own psychiatric examination of him. Following argument, a single justice of this court denied the petition.

[4]Lack of criminal responsibility, colloquially known as the "insanity defense," constitutes a complete defense to a crime. On the other hand, a defendant's inability to form the requisite intent for an element of the crime, commonly although incorrectly referred to as "diminished capacity," could reduce the verdict, in this case reducing the degree of guilt from murder in the first degree to murder in the second degree. See *Commonwealth* v. *Baldwin,* 426 Mass. 105, 106 n.1 (1997), cert. denied, 525 U.S. 820 (1998), and cases cited (describing mental impairment defense).

tion of a defendant in situations where the defendant intended to, or there was a reasonable likelihood that the defendant would, offer psychiatric testimony based on his or her own statements. We then set forth the proper procedures for a court-ordered psychiatric examination, which are now codified at Mass. R. Crim. P. 14 (b) (2) (B) (i)-(iv), 378 Mass. 874 (1979).[5] Although *Blaisdell* concerned the defense of lack of criminal responsibility, this court has implicitly recognized that the procedures set forth in that case and rule 14 (b) (2) (B) should be applied where the defendant raises an issue regarding his mental impairment. See *Commonwealth* v. *Harvey*, 397 Mass. 803, 807-808 n.2 (1986) (stating that, while the defendant did not raise traditional defense of lack of criminal responsibility, "the judge correctly followed the procedures set forth in *Blaisdell* and Mass. R. Crim. P. 14 [b] [2] [B] [i]-[iv] on the issue of mental impairment"); *Commonwealth* v. *Baldwin*, 426 Mass. 105, 109-110 (1997), cert. denied, 525 U.S. 820 (1998).

We see no reason to draw a distinction between cases involving a claim of mental impairment and those involving a claim of lack of criminal responsibility, as both "hinge on the workings of a defendant's mind at the time of the offense." *United States* v. *White*, 21 F. Supp. 2d 1197, 1200 (E.D. Cal. 1998). Neither the defendant's rights under the Fifth Amendment to the United States Constitution nor his rights under art. 12 of the Massachusetts Declaration of Rights are violated by a court-ordered interview, provided that the appropriate safeguards are followed. See *Blaisdell v. Commonwealth, supra* at 766 ("a defendant who seeks to put in issue his statements as the basis of psychiatric expert opinion in his behalf opens to the State the opportunity to rebut such testimonial evidence"). Our decision today regarding the availability of a court-ordered examination of a defendant who seeks to negate the mens rea of his or her

---

[5]Rule 14 (b) (2) (B) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 874 (1979), provides that "[i]f the notice of the defendant or subsequent inquiry by the judge or developments in the case indicate that statements of the defendant as to his mental condition at the time of or as to his criminal responsibility for the alleged crime will be relied upon by expert witnesses of the defendant, the judge, upon his own motion or upon motion of the prosecutor, may order the defendant to submit to a psychiatric examination consistent with the provisions of the General Laws . . . ."

crime through expert testimony is also consistent with the majority of jurisdictions that have considered the question.[6]

Such a rule allows for reciprocal discovery of psychiatric defenses and promotes "society's conduct of a fair inquiry." *Commonwealth* v. *Wayne W.*, 414 Mass. 218, 231 (1993), quoting *United States* v. *Byers*, 740 F.2d 1104, 1113 (D.C. Cir. 1984). We also conclude that the same procedures detailed in *Blaisdell* and rule 14 (b) (2) (B) (i)-(iv), which provide protections to defendants asserting a defense of lack of criminal responsibility, should apply to cases in which the defendant seeks to use expert testimony to negate the element of intent.[7]

(b) *Failure to provide manslaughter instruction.* The defendant contends that the judge erred in refusing to instruct the jury on manslaughter. An instruction on manslaughter is required where any view of the evidence will permit a finding

---

[6]See *State* v. *Schackart*, 175 Ariz. 494, 500-501 (1993), cert. denied, 511 U.S. 1046 (1994) (Blackmun, J., dissenting from denial of certiorari); *People* v. *Segal*, 54 N.Y.2d 58, 65-67 (1981); *State* v. *Hutchinson*, 135 Wash. 2d 863, 876-877 (1998), cert. denied, 525 U.S. 1157 (1999). Although the Federal courts appear to be split on the source of authority to order such an examination, see Fed. R. Crim. P. 12.2, the majority of the courts have determined that a District Court may order a psychiatric examination when a defendant seeks, through expert testimony, to establish that a mental impairment inhibited the formation of the mens rea requisite for a conviction. See, e.g., *United States* v. *Davis*, 93 F.3d 1286, 1295-1296 (6th Cir. 1996); *United States* v. *Lewis*, 53 F.3d 29, 35 n.9 (4th Cir. 1995); *United States* v. *Kessi*, 868 F.2d 1097, 1107-1108 (9th Cir. 1989); *United States* v. *Stackpole*, 811 F.2d 689, 697 (1st Cir. 1987); *United States* v. *White*, 21 F. Supp. 2d 1197, 1200 (E.D. Cal. 1998); United States vs. Holdaway, U.S. Dist. Ct. No. CR 99-10205-RCL-03 (D. Mass. 1999). But see *United States* v. *Marenghi*, 893 F. Supp. 85, 99 (D. Me. 1995). See also Comment, Is the Shrink's Role Shrinking? The Ambiguity of Federal Rules of Criminal Procedure 12.2 Concerning Government Psychiatric Testimony in Negativing Cases, 147 U. Pa. L. Rev. 1403, 1421 n.83 (1999) (collecting cases).

[7]Those procedures were followed in this case, with one exception. At one point the defendant asked for a copy of the appointed expert's report. The judge denied this request. According to the Commonwealth, it also was denied access to this report. Under rule 14 (b) (2) (b) (iii), the defendant, on motion, would have been entitled to a copy of the appointed expert's report, although it would then have also been released to the prosecution. In the circumstances of this case, however, any error by the judge was harmless. The court-appointed expert did not testify and his report was not admitted in evidence or used in any way by the prosecutor. Thus, despite the defendant's contention that he was prejudiced by the error, we conclude that it was harmless beyond a reasonable doubt.

of manslaughter and not murder. See *Commonwealth* v. *Martinez*, 393 Mass. 612, 613-614 (1985).

There was no basis whatsoever for a voluntary manslaughter instruction, as here there was no legally adequate provocation. There is also nothing to suggest that the judge erred in refusing to instruct the jury on involuntary manslaughter. As this court has recognized, "[a] killing without malice does not automatically become involuntary manslaughter. The traditional elements of involuntary manslaughter must be shown by evidence that the jury might believe before an instruction on involuntary manslaughter is required." *Commonwealth* v. *Sires*, 413 Mass. 292, 302-303 (1992). See *Commonwealth* v. *Ferreira*, 417 Mass. 592, 599 (1994). A judge need not provide an involuntary manslaughter charge if it is clear that the risk to the victim was nothing less than a "plain and strong likelihood that death would follow." *Commonwealth* v. *Souza*, 428 Mass. 478, 493 (1998).

Here, the testimony showed that the defendant walked over to the victim, pulled out a handgun that he previously had loaded with Black Talon ammunition, and shot the victim in the face. The risk of harm associated with his actions could only lead to a determination of malice, not that of wanton and reckless conduct. See *Commonwealth* v. *Ferreira, supra.* The defendant's reliance on *Commonwealth* v. *Knight*, 37 Mass. App. Ct. 92, 102-103 (1994), is therefore misplaced, as in that case the facts provided the basis for a manslaughter instruction. In any event, as the defendant concedes, the jury, by their verdict, specifically found that he had committed the murder with deliberate premeditation, thereby implying a finding of first prong malice. See *Commonwealth* v. *Gibson*, 424 Mass. 242, 247, cert. denied, 521 U.S. 1123 (1997). Accordingly, there was no error.

(c) *Ability of the defendant to premeditate.* The defendant, under G. L. c. 278, § 33E, urges us to reduce the degree of guilt because his mental impairment was inconsistent with the element of deliberate premeditation. There was ample evidence to support the jury's finding of deliberate premeditation. See *Commonwealth* v. *Gould*, 380 Mass. 672, 679 (1980) (role of jurors to "find the facts or issues on which they hear psychiatric testimony"). The Commonwealth produced evidence regarding the defendant's extensive steps in advance of the crime to establish an alternate identity, including his obtaining a false birth certificate and passport, as well as his consultation with a

friend regarding the "man-stopping" ammunition that he would later use to shoot the victim. In these circumstances, the jury were warranted in finding that he acted with the requisite intent toward the victim's sister, and, under the doctrine of transferred intent, see, e.g., *Commonwealth* v. *Santiago*, 425 Mass. 491, 502 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998), that the defendant was guilty of premeditated murder.

3. *Section 33E review.* Pursuant to our duties under G. L. c. 278, § 33E, we have reviewed the entire record. We find nothing that compels us to exercise our discretion to disturb the jury's verdict, either by reducing the verdict or granting a new trial.

*Judgment affirmed.*