## COMMONWEALTH vs. CHARLES T. OSTRANDER.

Berkshire. February 2, 2004. - March 30, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Rape. Evidence,* Voluntariness of statement, Hearsay. *Practice, Criminal,* Hearsay, Voluntariness of confession, Psychiatric examination.

At a criminal trial, the judge did not violate the defendant's constitutional right against self-incrimination by compelling the defendant to submit to a psychiatric examination by the Commonwealth's expert and by allowing the Commonwealth's expert to testify based on this compelled communication with the defendant, where the defendant waived his privilege against self-incrimination by placing at issue his mental ability voluntarily to waive his Miranda rights and make a statement thereafter. [351-355]

At a criminal trial, the judge did not abuse his discretion in admitting, on redirect examination of the Commonwealth's expert, testimony to rebut adverse inferences elicited during the expert's cross-examination, or in giving a limiting instruction to the jury regarding their use of such testimony. [355-357]

INDICTMENTS found and returned in the Superior Court Department on July 20, 2000.

The cases were tried before *Thomas J. Curley, Jr.,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Brownlow M. Speer,* Committee for Public Counsel Services (*Nathaniel K. Green,* Committee for Public Counsel Services, with him) for the defendant.

*Paul J. Caccaviello,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. A Superior Court jury convicted the defendant of five indictments charging forcible rape of a child under the age of sixteen years, and of seven indictments charging indecent assault and battery on a child under the age of fourteen years. The

victims were his two stepdaughters.[1] Represented by new counsel on appeal, the defendant argues that the trial judge (1) violated his privilege against self-incrimination under the Federal and State Constitutions in allowing the Commonwealth's motion to compel the defendant to submit to a psychological examination by an expert of the Commonwealth on the issues of the voluntariness of the defendant's waiver of his Miranda rights and of his subsequent confession to police; and (2) violated the defendant's privilege against self-incrimination under the Federal and State Constitutions by allowing, over objection, the Commonwealth's expert witness to give opinion testimony that the defendant had the ability knowingly and intelligently to waive his Miranda rights, based on the defendant's compelled communications to the expert. In addition, the defendant argues that he was prejudiced by the erroneous admission of hearsay evidence at trial. We granted the defendant's application for direct appellate review. Because we conclude that there was no constitutional error in compelling the defendant to submit to a psychological examination by the Commonwealth's expert and in allowing the Commonwealth's expert to testify at trial based on that compelled communication, and that the judge did not abuse his discretion in admitting hearsay evidence at trial, we affirm the judgments of conviction.

*Background.*

1. *Pretrial motions.* Prior to trial, the defendant moved to suppress his confession and written statement on the ground that he did not make a knowing and intelligent waiver of his Miranda rights. At the evidentiary hearing on the motion, the Commonwealth called as witnesses Detective Robert Canale of the North Adams police department, Kelly Carnevale of the Department of Social Services (department), and Rebecca Maria Garcia, a social worker who had been working with the Ostrander family since May of 1998. Canale and Carnevale described the defendant's demeanor as generally calm and cooperative when they first met with him at the family's house and later at the police station, where he confessed to having sexually assaulted the two victims, whom we shall call Sarah

---

[1] In 1995, the defendant adopted his wife's daughters, including the victims, making them his adopted daughters.

and Susan. The defendant was articulate and did not appear to be under the influence of any substances. Canale and Carnevale also stated that prior to his confession, the defendant was read the Miranda warnings three times and appeared to understand them. Garcia testified that the defendant was the "more capable parent," and essentially ran the household. She stated that she never had trouble understanding the defendant, that he appeared to understand her, was responsive, had a good memory and an appropriate vocabulary, and was cooperative.

The defendant called Dr. Paul Spiers, a neuropsychologist, to testify. Dr. Spiers stated that he administered a series of mental ability tests on the defendant and reviewed various records, including police reports, grand jury minutes, and the defendant's school and mental health records. Dr. Spiers diagnosed the defendant as being mentally retarded, having a "full scale [intelligence quotient or] IQ of sixty-five,"[2] and opined that the defendant's waiver of his Miranda rights was not voluntary because the defendant did not have "an adequate understanding" of those rights. The judge found that "the Commonwealth has proven, beyond a reasonable doubt, in the totality of the circumstances, including, in particular, the [d]efendant's very limited intelligence, that he . . . has made a knowing, voluntary and intelligent waiver of [his] Miranda rights," and denied the defendant's motion to suppress. *Commonwealth* v. *Medeiros*, 395 Mass. 336, 347 (1985) (mentally deficient adult, or adult with "subnormal intelligence," may effectively waive Miranda rights and render "voluntary, knowing, and admissible confession"). See *Commonwealth* v. *Jackson*, 432 Mass. 82, 86-87 (2000) (judge did not err in choosing to disbelieve testimony of defendant's expert neuropsychologist that defendant had IQ of sixty-five and was thus incapable of "freely waiving his rights or freely communicating with the police," and concluding that, in "the totality of the circumstances," defendant's waiver was valid). Cf. *Commonwealth* v. *Rivera*, *post* 358, 366 (2004) (defendant's "detailed description of the murder and his attempts to cover-up the crime belies a person" suffering from mental illness).

---

[2]The record indicates that an intelligence quotient (IQ) score below seventy is one of several criteria of mental retardation. The test used to measure a person's IQ has a margin of error of approximately three to five points.

Thereafter, the Commonwealth filed a motion to compel the defendant to submit to a psychiatric examination. In the affidavit accompanying the motion, the Commonwealth represented that defense counsel intended to call Dr. Spiers to testify at trial concerning whether the defendant's waiver of his Miranda rights was voluntary. The Commonwealth sought to have its own expert evaluate the defendant's mental condition in order to rebut Dr. Spiers's expected trial testimony on the subject. The judge allowed the motion.

2. *The Commonwealth's case.* Based on the Commonwealth's evidence, the jury could have found the following facts. In 1992, the defendant married a woman who had four daughters, including the victims, Sarah and Susan, by her former boy friend. In 1995, the defendant adopted all four children.

When Sarah was approximately four or six years old, she and Susan lived with their mother, two sisters, and the defendant in Vermont. Around that time, the defendant began to touch Sarah's chest, buttocks, and vagina with his hands and penis. When Sarah was ten or eleven, the family moved to North Adams, Massachusetts, where the defendant continued to touch Sarah in the same manner. He also attempted to penetrate Sarah vaginally and anally with his penis, but she resisted. The defendant was able, however, to force his penis into her mouth many times. Sarah told the defendant several times to stop, but he said he was unable due to "hormones."

While living in North Adams, the defendant also began sexually assaulting Susan, who was then eight years of age. He took off her clothes and touched her breasts and vagina with his hands, mouth, and penis. On many occasions, the defendant forced his penis into Susan's vagina, anus, and mouth. When he ejaculated into Susan's mouth, he told her to drink it. She asked him to stop and tried pushing him away, but to no avail.[3]

In May of 2000, the defendant moved out and began to live

---

[3]Sometimes, the defendant promised Susan money if she let him touch her. The defendant also showed both girls videotapes of people engaged in sexual activity, and then engaged them in similar acts. He forced each of the girls to act as a lookout when he was with the other. The defendant instructed both girls not to tell anyone about the abuse; he told Sarah that if she disclosed the abuse to anyone, she would have to live in a foster home.

with another woman. Susan then told her biological father that the defendant had been sexually assaulting her. As a result, the father telephoned the North Adams police department and Sarah and Susan's aunt. On learning that Susan disclosed the abuse, Sarah told the aunt that the defendant had been sexually abusing her (Sarah) as well.

The department and the North Adams police department commenced an investigation. The girls separately spoke with the department's investigator, Kelly Carnevale, and Detective Canale. While the investigators were at the house, the defendant arrived. After informing the defendant of the allegations of sexual abuse against him, Canale gave the defendant the Miranda warnings. The defendant denied the allegations. During this conversation, the defendant remained calm and appeared to understand his rights. Canale then suggested that the conversation continue at the police station. The defendant agreed; he arrived at the station in a separate vehicle.

Canale and Carnevale met the defendant in Canale's office, where the defendant was again given the Miranda warnings and appeared to understand them. The defendant signed a document listing the Miranda warnings and a waiver of those rights. The defendant's demeanor remained calm and he did not appear to be under the influence of any intoxicating substance.

Initially, the defendant denied the allegations. After twenty or thirty minutes, Canale and Carnevale left the office for about five to ten minutes so that Canale could consult with the district attorney's office. On their return, Canale advised the defendant that he felt the defendant was not being truthful and was placing him under arrest. The defendant stated that he "might as well" tell them and cooperate.

Canale reminded the defendant again of the Miranda warnings and the defendant again appeared to understand them. Canale asked the defendant to "tell [him] what happened" and typed the defendant's statement into his computer as the defendant spoke. Canale then printed the statement and asked the defendant to read it to make sure it contained no mistakes or omissions, and sign it. After looking at the statement, the defendant signed it without making any changes. In the statement, the defendant described in great detail his sexual abuse of

Sarah and Susan that occurred in both Vermont and Massachusetts.

The defendant's written statement was admitted in evidence and was read to the jury. The judge then gave the jury a "humane practice" instruction,[4] which he repeated in his final charge to the jury.[5] See *Commonwealth* v. *Tavares*, 385 Mass. 140, 152-153, cert. denied, 457 U.S. 1137 (1982).[6]

[4]The judge explained:

> "Whether these statements were made at all is a preliminary factual question for you to decide, but even if some or all of those statements were made, they cannot be used by you as evidence unless the Commonwealth proves beyond a reasonable doubt, based on the totality of the circumstances that the defendant made those statements voluntarily. A statement is voluntary if it is the product of a rational intellect and a free will. If the Commonwealth does not meet its burden on this point, then you may not consider any statements made by the defendant as evidence. . . .

> "The factors you should consider [in determining whether any statement made by the defendant was made voluntarily] include . . . whether the defendant received and understood his Miranda warnings.

> "A person in police custody is entitled to receive Miranda warnings before responding to any police questioning. The Miranda warnings inform a person in custody of his right to remain silent, that anything he says may be used against him as evidence in [c]ourt, that he has the right to have an attorney represent him during any questioning and that if he cannot afford a lawyer, one will be appointed for him, free of charge, by the Commonwealth.

> "In determining whether the defendant made any statements voluntarily you should consider as one of the circumstances whether the defendant received and understood his Miranda warnings before answering any [police] questions."

The judge also gave this "humane practice" instruction after Carnevale testified to the substance of the defendant's confession.

[5]The judge also stated: "A person of low intelligence may understand his Miranda rights. Such a person may also voluntarily speak to the police. But a jury must give special attention to whether a person of low intelligence understood his Miranda rights and voluntarily made a statement to the police."

[6]Whether a defendant has validly waived his Miranda rights is a question of law for the judge. *Commonwealth* v. *Tavares*, 385 Mass. 140, 153 n.19, cert. denied, 457 U.S. 1137 (1982). The question whether a defendant thereafter made a voluntary incriminating statement to police is, in the first instance, to be decided by the judge "at a preliminary hearing in the absence of the jury" (if there is evidence making it an issue), and if the judge determines and

3. *The defendant's case.* The defendant's wife testified that sometime after May of 2000, the defendant moved out of the family home. She stated that the defendant was in a relationship with another woman, and that the wife began to reconcile with her former boy friend. Toward the end of June, 2000, however, the defendant approached her in an attempt to reconcile with him. The wife stated that, when she told her former boy friend that the defendant wanted to "work things out," he said that if she did, he would "make [her] lose [her] kids." The wife also testified that Susan told her that she (Susan) did not mean to put the defendant in jail and only made the accusation to get back at the defendant for leaving the family. The wife said that the defendant had begun moving back into the house the day Canale and Carnevale arrived.

The defendant also called Dr. Spiers to testify at the trial. Dr. Spiers testified that he administered a number of tests to the defendant from which he concluded that the defendant had an IQ of sixty-five, that his intellectual functioning was that of a ten to twelve year old, and that he would be considered moderately mentally retarded.[7] Based on these tests, as well as the review of other reports and records,[8] Dr. Spiers concluded that the defendant's ability to understand and appreciate the Miranda warnings was very low, and that he did not voluntarily waive his Miranda rights. Concerning the voluntariness of the defendant's statement to police, Dr. Spiers opined that it was not voluntary because the defendant was unable to refuse to comply with perceived demands of authority figures.

4. *Rebuttal evidence.* In rebuttal, and over the defendant's

makes an affirmative finding that the statements were voluntary, the question of voluntariness is then to be considered, and decided, by the jury with appropriate instructions from the judge. *Id.* at 149-150. Specifically, the judge must instruct the jury that "the Commonwealth has the burden of proving beyond a reasonable doubt that the statement was voluntary and that the jurors must disregard the statement unless the Commonwealth has met its burden." *Id.* at 152. In making "its over-all determination of voluntariness" of a statement, a jury may consider whether a defendant's waiver of his Miranda rights was voluntary. *Id.* at 153 n.19.

[7] Dr. Spiers admitted during his cross-examination that the IQ test is only one of several criteria for determining whether an individual is mentally retarded, and that he did not administer any tests to evaluate the other criteria.

[8] Dr. Spiers did not speak with the defendant's friends, family members, or the social workers who had dealt with the defendant for long periods of time.

objection, the Commonwealth called Dr. J. Roger Goldin, a clinical forensic psychologist. Dr. Goldin examined the defendant in November of 2001, and conducted a follow-up interview by telephone. One of Dr. Goldin's colleagues also evaluated the defendant and spoke to one of the defendant's close friends. In addition to conducting various tests, Dr. Goldin reviewed other records and reports.[9] Based on his examination of the defendant and the surrounding circumstances, Dr. Goldin opined that, although the defendant's range of intellectual functioning was measured to be mildly mentally retarded to borderline (with an IQ score of 67),[10] the defendant did not meet a diagnosis of mental retardation and demonstrated the ability to knowingly and intelligently waive his Miranda rights. Dr. Goldin was not asked to offer an opinion on the defendant's ability or inability to make a voluntary statement to police.

The Commonwealth also called Rebecca Maria Garcia, the other department social worker. Garcia testified that she had been working with the Ostrander household since May of 1998. She stated that the defendant was her primary contact person for the family, and that she met with him approximately one dozen times. Garcia also testified that she found the defendant's vocabulary appropriate "and relevant to the conversation at hand," and that he would appropriately ask and answer questions.

*Discussion.*

1. *Compelled psychological examination.* The defendant argues that it was constitutional error for the judge to order him to submit to a psychological examination by the Commonwealth's expert, Dr. Goldin, and to allow Dr. Goldin to give opinion testimony at trial based on the defendant's compelled

---

[9]Both psychologists based their opinions regarding the defendant's mental functioning on the following sources: the defendant's own statements, the results of various tests administered to the defendant, the defendant's counselling and educational records, and police reports. Dr. Goldin's testimony was restricted to the topics on which Dr. Spiers testified. Furthermore, at oral argument, defense counsel conceded that Dr. Goldin did not ask the defendant any questions concerning the underlying facts of the case.

[10]"Borderline intellectual functioning" is represented by an IQ score ranging from seventy to seventy-nine. In reaching his conclusion, Dr. Goldin took into account the three to five point margin of error inherent in the test.

testimonial communications to him. The Commonwealth concedes that its psychological examination of the defendant implicated the privilege against self-incrimination, but contends that the defendant waived that privilege "by eliciting expert testimony evaluating his mental status at the time he confessed to sexually abusing his stepdaughters." We agree and conclude that there was no error in compelling the defendant to submit to such an examination and in allowing Dr. Goldin to testify based on this compelled communication with the defendant.

Where the defendant places at issue his mental ability voluntarily to waive his Miranda rights and make a voluntary statement thereafter, it is a natural and reasonable extension of *Blaisdell* v. *Commonwealth*, 372 Mass. 753 (1977); *Commonwealth* v. *Diaz*, 431 Mass. 822 (2000); and *Commonwealth* v. *Contos*, 435 Mass. 19 (2001), to require the defendant to submit to an examination so that the Commonwealth may rebut the defendant's expert testimony on the subject. In *Blaisdell* v. *Commonwealth*, *supra* at 766, the court reasoned that "a defendant who seeks to put in issue his statements as the basis of psychiatric expert opinion in his behalf opens to the State the opportunity to rebut such testimonial evidence in essentially the same way as if he himself had testified."[11] The court held that a judge could order a psychiatric examination of a defendant, pursuant to a specific procedure now codified at Mass. R. Crim. P. 14 (b) (2) (B), 378 Mass. 874 (1979), in situations where the defendant intended to, or there was a reasonable likelihood that the defendant would, offer psychiatric testimony based on his or her own statements to support a defense of lack of criminal responsibility. *Blaisdell* v. *Commonwealth*, *supra* at 766-769. In *Commonwealth* v. *Diaz*, *supra* at 829-830, the court extended the holding in *Blaisdell*, as well as the procedural safeguards, to situations where a defendant sets forth a claim of mental impair-

[11]The court also noted that the defendant's privilege against self-incrimination is not violated where he is ordered to submit to a psychiatric examination "so that the jury may have the benefit of countervailing expert views, based on similar testimonial statements of a defendant in discharging its responsibility of making a true and valid determination of the issues thus opened by a defendant." *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 766 (1977), and cases cited.

ment to negate the mens rea of the charged crime.[12] Finally, to the extent that any ambiguity remained concerning the application of *Blaisdell*, the court, in *Commonwealth* v. *Contos, supra* at 24 n.7, noted that the holding in the *Blaisdell* case "is not limited to its facts," and that "[t]he policy justifying reciprocal discovery when the defendant places his statements and mental state in issue applies with equal force to an alleged inability to premeditate or form a specific intent to kill as it does to the lack of criminal responsibility defense raised in *Blaisdell*."

The reasoning underlying *Blaisdell* and its progeny, namely that where a defendant places at issue his mental state at a critical time, the jury should have the benefit of "countervailing expert views, based on similar testimonial statements of a defendant" in order to reach a fair result, applies with equal force in this case. *Blaisdell* v. *Commonwealth, supra* at 766. See *Commonwealth* v. *Contos, supra*; *Commonwealth* v. *Diaz, supra*; *Commonwealth* v. *O'Connor*, 7 Mass. App. Ct. 314, 317 (1979). Here, the defendant challenged the voluntariness of his confession to police by eliciting testimony from Dr. Spiers, based in part on the defendant's statements to him, regarding the defendant's mental state at the time of the confession. By doing so, the defendant waived his privilege against self-incrimination on this issue and made it permissible for the Commonwealth to introduce in evidence Dr. Goldin's testimony, also based in part on the defendant's statements. See, e.g., *Blaisdell* v. *Commonwealth, supra*. Under *Blaisdell* and its progeny, the judge did not violate the defendant's constitutional privilege against compulsory self-incrimination by ordering the defendant to submit to a psychiatric examination. Nor did he violate this privilege in admitting Dr. Goldin's opinion testimony based on statements made to him by the defendant during the course of that examination.

The defendant argues that *Blaisdell* and its progeny apply only to situations where the workings of a defendant's mind at the time of the offense is at issue, but are inapposite in situa-

[12]The court noted that "[s]uch a rule allows for reciprocal discovery of psychiatric defenses and promotes 'society's conduct of a fair inquiry.' " *Commonwealth* v. *Diaz*, 431 Mass. 822, 830 (2000), quoting *Commonwealth* v. *Wayne W.*, 414 Mass. 218, 231 (1993).

tions involving the defendant's mental condition at the time of his confession. We reject the defendant's narrow interpretation of the relevant case law, because it does not take into account that it is the defendant who is placing his mental state at issue, and the challenged mental state does not concern a collateral issue, but rather a defense set forth by the defendant.

Furthermore, such an interpretation would be fundamentally unfair to the Commonwealth, permitting a one-sided presentation of expert evidence not only to the motion judge, but also to the jury who must find that the confession was voluntary beyond a reasonable doubt. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 152 (1982). Permitting only one party to introduce expert testimony on a crucial issue would have a "distorting effect on the fact finder's role," *Commonwealth* v. *Wayne W.*, 414 Mass. 218, 231 (1993), and undermine "society's conduct of a fair inquiry." *Id.*, quoting *United States* v. *Byers*, 740 F.2d 1104, 1113 (D.C. Cir. 1984). It would be both "unfair and improper to allow a defendant to introduce favorable psychological testimony and then prevent the prosecution from resorting to the most effective and in most instances the only means of rebuttal: other psychological testimony. The principle also rests on 'the need to prevent fraudulent mental defenses.' " *Schneider* v. *Lynaugh*, 835 F.2d 570, 576 (5th Cir.), cert. denied, 488 U.S. 831 (1988), quoting *Vardas* v. *Estelle*, 715 F.2d 206, 209 (5th Cir. 1983), cert. denied sub nom. *Vardas* v. *McKaskle*, 465 U.S. 1104 (1984). For these reasons, that Dr. Spiers would be subject to cross-examination is an inadequate substitute for actual testimony from another qualified expert who has examined the defendant.[13]

Court-ordered examinations are not limited to determining

---

[13]The defendant's reliance on *State* v. *Davis*, 254 Wis. 2d 1 (2002), is misplaced. In the *Davis* case, the defendant intended to introduce expert psychological testimony at trial to show that he lacked the psychological characteristics of a sex offender. *Id.* at 9-10. The court concluded that, because the defendant did not seek to introduce the proffered evidence "to support a particular defense related to his mental capacity," the mere introduction of such "character profile" evidence did not, in this case, constitute a waiver of the privilege against self-incrimination. *Id.* at 24. The court, however, stated that a waiver could result "in some cases." *Id.* at 25. The *Davis* case is distinguishable, because here the defendant's proffered evidence places his mental capacity, as distinguished from his character, squarely at issue.

criminal responsibility or mental impairment. See G. L. c. 123, § 15 (judge may order defendant to be examined to determine competency to stand trial).[14] Other courts have ruled in different contexts that a defendant who intends to place his mental condition at issue by presenting expert testimony may be compelled to submit to a psychiatric examination by the prosecution's expert without violating any right against self-incrimination. For example, where a defendant raises the defense of diminished capacity, he places his mental status at issue and is subject to compelled psychiatric examination; admission of the defendant's statements to a psychiatrist does not violate his privilege against self-incrimination. *United States* v. *Halbert,* 712 F.2d 388, 390 (9th Cir. 1983), cert. denied, 465 U.S. 1005 (1984). See *Commonwealth* v. *Morley,* 545 Pa. 420, 426-427 & n.4 (1996). In addition, by giving notice that he intends to present evidence of his mental condition at the penalty phase of his trial to support a claim of mitigating circumstances, a capital defendant waives his privilege against self-incrimination, enabling the prosecution to introduce psychiatric testimony. *Savino* v. *Commonwealth,* 239 Va. 534, 543-544, cert. denied, 498 U.S. 882 (1990). Furthermore, where a defendant places her mental state at issue by relying on a defense based on battered woman syndrome, the prosecution is entitled to have the defendant examined by its expert and have its expert testify to rebut the defense expert's testimony without violating the defendant's privilege against self-incrimination. See, e.g., *State* v. *Briand,* 130 N.H. 650, 657 (1988). See also *State* v. *Hickson,* 630 So. 2d 172, 176 (Fla. 1993); *State* v. *Hess,* 252 Mont. 205, 211 (1992); *State* v. *Myers,* 239 N.J. Super. 158, 169-170 (App. Div. 1990); *State* v. *Manning,* 74 Ohio App. 3d 19, 24 (1991), cert. denied, 504 U.S. 918 (1992).

2. *Hearsay evidence.* During cross-examination, Dr. Goldin agreed that the defendant "believed . . . that failure to submit to authority would lead to further trouble." Dr. Goldin also admitted that, in an "adversarial" setting, nervousness might have negatively affected the defendant's "ability to think

[14]Statements made by the defendant during a psychiatric examination may be admissible on the issue of his mental condition. See *Commonwealth* v. *O'Connor,* 7 Mass. App. Ct. 314, 317 (1979).

through what his rights were." During his redirect examination, Dr. Goldin testified that the possibility that nervousness could have negatively affected the defendant's abilities with respect to the Miranda warnings was not a factor in his assessment, because the police officers informed him that they thought that the defendant "was comfortable and . . . wasn't anxious and that he was responsive." The judge instructed the jury that Dr. Goldin's testimony was not offered for its truth to prove that the defendant was or was not nervous, but only to show the "information base that Dr. Goldin had."

The defendant asserts that Dr. Goldin's testimony during his redirect examination was inadmissible hearsay. He further claims that the judge's limiting instruction was based on a "flawed" premise and did not cure the error.[15] We disagree.

The scope of redirect examination is a matter "within the discretion of the trial judge, reviewed only for an abuse of discretion." *Commonwealth* v. *Olszewski*, 416 Mass. 707, 718 (1993), cert. denied, 513 U.S. 835 (1994). The purpose of redirect examination is to allow a witness to explain, correct, or rebut adverse testimony or inferences elicited during cross-examination. *Id. Commonwealth* v. *Marrero*, 427 Mass. 65, 69 (1998). Here, the rebuttal testimony was properly elicited to counter the erroneous impression left by defense counsel that the defendant was nervous during his encounter with the police. See *id.*; *Commonwealth* v. *Olszewski, supra.* In addition, Dr. Goldin's testimony was cumulative of Canale's testimony and, as such, could not have prejudiced the defendant. See *Commonwealth* v. *Murphy*, 426 Mass. 395, 403 (1998); *Commonwealth* v. *Connolly*, 356 Mass. 617, 625, cert. denied, 400 U.S. 843 (1970). That the cumulative nature of the evidence was not established by testimony from the other detective matters not. The judge did not abuse his considerable discretion in admitting the testimony and in giving the limiting instruction to the jury. See *Commonwealth* v. *Pagan*, 440 Mass. 84, 88 (2003);

---

[15]He maintains that the limiting instruction was flawed because Dr. Goldin had *not* based his opinion on what the police officers had told him. The defendant further contends that the error violated his right to confront witnesses under the Federal and State Constitutions because only one of the detectives Dr. Goldin spoke with (namely, Canale) testified at trial. He argues that the error prejudiced him.

*Commonwealth* v. *Roberts*, 433 Mass. 45, 51 (2000), quoting *Commonwealth* v. *Johnson*, 41 Mass. App. Ct. 81, 89 (1996) (judge has "nearly unreversible discretion" to allow rebuttal testimony).

*Conclusion.* For the foregoing reasons, we conclude that there was no error in compelling the defendant to submit to psychiatric examination and in allowing the Commonwealth's expert to testify based on this compelled communication with the defendant. Furthermore, the trial judge did not abuse his discretion in admitting hearsay statements in evidence.

*Judgments affirmed.*